PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 94-7089
_____

D. C. Docket No. CV-87-T-1223-N

JOHN DILLARD, DAMASCUS CRITTENDEN, JR.,
EARWEN FERRELL, CLARENCE J. JARRELLS,
ULLYSSES MCBRIDE, LOUIS HALL, JR.,

Plaintiffs-Appellees,

BOBBY SINGLETON, TERESA BURROUGHS,
J.S. THOMAS, MAMIE KENNEDY,

Intervenors-Plaintiffs-Appellees,

versus

CITY OF GREENSBORO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

**(January 3, 1996)**

Before BIRCH, Circuit Judge, CLARK and WEIS*, Senior Circuit
Judges.

* Honorable Joseph F. Weis, Jr., Senior U.S. Circuit Judge for
the Third Circuit, sitting by designation.

**BIRCH, Circuit Judge:**

This case presents our circuit's first opportunity to reexamine the drawing of voting districts following the Supreme Court's decision in <u>Miller v. Johnson</u>, __ U.S. __, 115 S. Ct. 2475, 132 L. Ed. 2d 76 (1995). Because the district court did not have the benefit of <u>Miller</u> when it adopted the challenged redistricting plan, we remand the case to allow the district court to reevaluate the plan under <u>Miller</u>.

## I.  BACKGROUND

Over a decade ago, this case originated as a class-action brought by black citizens of Alabama ("Dillard") to challenge the at-large voting systems[1] used to elect county commissioners in nine Alabama counties.[2] In 1987, Dillard amended the complaint by adding the City of Greensboro, Alabama ("Greensboro"),[3] among other cities, counties and county school boards, as a defendant and alleging that th[e] at-large system used to elect the Greensboro city council violated section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 (1994). Section 2 provides that no state or political subdivision may impose or apply a voting qualification or prerequisite to voting or any standard, practice, or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on accou[nt] of race or color." 42 U.S.C. § 1973(a). Dillard claims that, under the at-large system, "the political processes . . . are not equally open to participation by [blacks] . . . in that [blacks] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

---

[1]     At-large voting systems use multimember voting districts where constituents vote for more than one candidate, and all elected candidates represent the same district rather than their individual districts. This system often makes it difficult for minority groups to elect candidates of their choice because they do not make up a majority of the population. Such a procedure also is known to result in a dilution of voting power. <u>See</u> <u>Rogers v. Lodge</u>, 458 U.S. 613, 616-17, 102 S. Ct. 3272, 3275, 73 L. Ed. 2d 1012 (1982).

[2]     For a synopsis of the procedural history of this action, see <u>Dillard v. Baldwin County Board of Education</u>, 686 F. Supp. 1459 (M.D. Ala. 1988).

[3]     Greensboro is located in Hale County in western Alabama. According to the 1990 census, Greensboro has a total population of 3,047. Blacks comprise 62% of the population and 56% of the voting age population.

2

Pursuant to a 1987 consent decree, Greensboro conceded that its at-large system violated section 2 of the Voting Rights Act.[4] To remedy this violation, Greensboro and Dillard submitted competing redistricting plans. R1-1-1; Supp.R1-492. The district court referred the case to a United States magistrate judge to serve as a special master in the case. Two evidentiary hearings were conducted by the magistrate judge in 1988, but no redistricting plan was adopted. In May 1992, the parties agreed that the plans that had been submitted to the court in 1988 could no longer be used because of demographic changes identified in the 1990 census. Consequently, new plans were submitted by Dillard and Greensboro. The cou adopted Greensboro's single-member districting plan on an interim basis.[5]

Greensboro conducted municipal elections in 1992 pursuant to this interim plan.

The 1992 plan had five districts; in three of them, African-Americans were a majority of the voting age population. District 1 contained a black voting age population of 83%; District 2 contained a black voting age population of 58%; and District 3 contained a black voting age population of 75%. Districts 1 and 3 elected black councilmembers in 1992, and District 2 elected a white candidate over a black candidate.

Dillard v. City of Greensboro, 865 F. Supp. 773, 774 (M.D. Ala. 1994). In December 1992, the Attorney General concluded that the 1992 plan improperly "fragmented black population concentrations in order to lower the black percentage in District 2," and refused to preclear the plan. R2-66-2 (emphasis added). T Attorney General pointed to the fact that "a black-supported candidate in District 2 was defeated" as evidence of racial gerrymandering. Id.

In August 1993, Greensboro submitted a new plan to the Attorney General for preclearance. The 1993 plan created three majority-black districts. District 1 contained a black voting age population of 83%; District 2 contained a black voting age population of 63%; and District 3 contained a black voting age population of 73%. Once again, the Attorney General refused to preclear the plan under section 5. The Attorney General found that, although the black voting age population of District 2 had been increased fro 58% to 63%, the 1993 plan still improperly hindered blacks from electing candidates of their choice. The Attorney General made the following observations:

[T]he opportunity for black voters to elect a representative of their choice in [District 2] appears to have been constrained deliberately, taking into account the continued fragmentation of black population concentrations, the pattern of racially polarized voting

---

[4] The parties in the amended class action agreed for the district court to treat 165 out of the 183 jurisdictions challenged as individual lawsuits, with separate files and civil action numbers. Greensboro is one of those 165 jurisdictions. Dillard v. Baldwin County Bd. of Edu., 686 F. Supp. at 1461.

[5] Section 5 of the Voting Rights Act requires that the United States Attorney General preclear any plan proposed by a State or political subdivision that is subject to 42 U.S.C. § 1973b. 42 U.S.C. § 1973c. The Code of Federal Regulations, however, provides that a federal court may authorize the emergency interim use of a redistricting plan without first getting approval of the Attorney General. 28 C.F.R. § 51.18(c) (1995).

and the reduced electoral participation by black persons, which is traceable to a history of discrimination.

The city has provided no satisfactory explanation for limiting black electoral opportunities in this manner. Indeed, the city was aware of several alternative plans that created three districts in which black voters constituted a greater majority of the voting age population in a third district than in proposed District 2. While the city was not required under the Voting Rights Act to adopt any specific alternative plan, it is not free to adopt a districting plan which, as would appear here, is calculated to limit black voting strength.

R2-90-Attach. at 2.

In January 1994, Dillard filed a renewed motion for further relief and requested that the magistrat judge recommend adopting Dillard's plan, submitted twice previously, in 1991 and 1993. On October 11, 199 the district court approved the magistrate judge's recommendation, adopted the single-member redistricting plan proposed by Dillard, and ordered immediate new elections.[6] The plan adopted by the district court in 1994 and currently at issue in this appeal has three majority-black districts containing black voting age populations in the respective districts of 85%, 80% and 76%. Greensboro claims that the district court erred in adopting Dillard's plan because it allegedly is a race-conscious effort to guarantee direct proportionality of representation by manipulating district lines.[7]

## II.  ANALYSIS

The issue before this court is whether the redistricting plan proposed by Dillard and approved by the district court in 1994 constitutes a violation of section 2 of the Voting Rights Act or fails to corre Greensboro's violation of section 2. We examine the findings of the district court under the "clearly erroneous" standard. Rogers v. Lodge, 458 U.S. at 627, 102 S. Ct. at 3281; Dillard v. Crenshaw County, 83

---

[6]    A plan prepared and adopted by a federal court to remedy a section 2 violation is not subject to the preclearance requirements of section 5. McDaniel v. Sanchez, 452 U.S. 130, 138, 101 S. Ct. 2224, 2230, 68 L. Ed. 2d 724 (1981).

Greensboro moved for a stay of the district court's order pending the outcome of this appeal. That stay was denied by the district court. Dillard v. City of Greensboro, 870 F. Supp. 1031 (M.D. Ala. 1994).

[7]    Dillard cites United States v. Hayes, __ U.S. __, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995), in support of his contention that Greensboro has no standing to challenge the district court's decision. In Hayes, the Court held that plaintiffs, who were not residents of the district that was the focus of their racial gerrymandering claim and could not demonstrate that they had been subjected to racial classification, did not have standing to challenge Louisiana's congressional redistricting plan. Id. at __, 115 S. Ct. at 2437. Here, Greensboro is a defendant in the action and properly appeals the final decision of the district court pursuant to 28 U.S.C. § 1291.

4

F.2d 246, 248 (11th Cir. 1987). When evaluating whether Dillard's proposed plan provides an adequate reme for the section 2 violation, the district court must determine that the remedy itself satisfies section 2. Dillard v. Crenshaw County, 831 F. 2d at 249 (citing Edge v. Sumter County Sch. Dist., 775 F. 2d 1509, 151 (11th Cir. 1985) (stating that a "district court could not validly adopt a reapportionment plan without determining whether the plan complied with Section 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1973")).

A. Application of Miller

The Supreme Court's decision in Miller governs our analysis of this case. At the heart of Miller i the Court's determination that, when those drawing voting district lines use race as the "predominant" factor or place more value on race than on other traditional considerations, such as compactness and contiguity, the voting districts must satisfy strict scrutiny, "our most rigorous and exactive standard of constitutional review." Id. at __, 115 S. Ct. at 2490. At issue in Miller was Georgia's congressional redistricting plan; specifically, "whether Georgia's new Eleventh District gives rise to a valid equal protection claim . . . and, if so, whether it can be sustained nonetheless as narrowly tailored to serve a compelling governmental interest." Id. at __, 115 S. Ct. at 2482. In 1991, the Georgia General Assembly submitted a congressional redistricting plan to the Attorney General for preclearance as required by secti 5 of the Voting Rights Act. Id. at __, 115 S. Ct. at 2483. The plan called for an increase in the number of majority-black districts from one to two. Id. The Attorney General refused preclearance, however, and "noted a concern that Georgia had created only two majority-minority districts, and that the proposed plan did not 'recognize' certain minority populations by placing them in a majority-black district." Id. at __ 115 S. Ct. at 2483-84 (citation omitted). The General Assembly then submitted a second plan to the Attorn General for preclearance, but the Justice Department, concluding "that Georgia had 'failed to explain adequately' its failure to create a third majority-minority district," again refused preclearance. Id. a __, 115 S. Ct. at 2484 (citation omitted). For the third time, the General Assembly attempted to create a plan that would be acceptable to the Attorney General. It created three majority-minority districts using as a model the "max-black" plan proffered by the American Civil Liberties Union. Id. This final plan formed an Eleventh District that was drawn predominantly based on race. Id. at __, 115 S. Ct. at 2485.

The Court began its analysis of the Georgia plan by summarizing its holding in a previous redistricting case, Shaw v. Reno, __ U.S. __, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993). In Shaw, the Cou applied the Equal Protection Clause of the Fourteenth Amendment in the voting rights context and held that "redistricting legislation that is so bizarre on its face that it is 'unexplainable on grounds other than race' . . . demands the same close scrutiny that we give other state laws that classify citizens by race." Id. at __, 115 S. Ct. at 2825 (quoting Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266, 97 S. Ct. 555, 564, 50 L. Ed. 2d 450 (1977)). In Miller, the Court clarified Shaw: "Just as the Sta may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks . . so did we recognize in Shaw that it may not separate its citizens into different voting districts on the

5

basis of race." <u>Miller</u>, __ U.S. at __, 115 S. Ct. at 2486 (citations omitted).  In <u>Miller</u>, the Court warn federal courts that reviewing redistricting legislation "represents a serious intrusion on the most vital local functions."  <u>Id.</u> at __, 115 S. Ct. at 2488.  The Court also noted that it is often difficult for a court to distinguish "between being aware of racial considerations and being motivated by them."  <u>Id.</u>

B.  District Court's Analysis of the Plan

Dillard attempts to distinguish this case from <u>Miller</u> by arguing in his supplemental brief that, unlike <u>Miller</u>, the Greensboro plan was adopted by a federal district court, not a legislature.  We do not find any merit in this distinction.  Whether a redistricting plan is adopted by a court or a legislature does not affect a party's right to challenge the plan.  Admittedly, we are faced with an unusual factual situation here.  In most voting rights cases, the redistricting plan that is challenged is one developed b a legislature.  Here, the plan was developed by Dillard, adopted by the district court, and is now challenged by Greensboro.  Despite the unusual posture of the case, however, we find that Greensboro has equal standing with Dillard to challenge the district court's plan.

If the district court determines on remand that racial gerrymandering exists, then the redistrictin plan will be the subject of strict scrutiny.  Under the strict scrutiny test, the plan must be shown to be narrowly tailored to achieve a compelling state interest.  This test will be satisfied if evidence of past discrimination is shown and there is a sufficient evidentiary basis to establish that the plan is narrowly tailored to remedy that discrimination.  <u>Id.</u> at __, 115 S. Ct. at 2491.

The Supreme Court requires that district courts evaluate redistricting plans in terms of "traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests."  <u>Id.</u> at __, 115 S. Ct. at 2488.  Our review of the record, particularly the hearings conducted by the magistrate judge in 198 1992 and 1993, show an overwhelming emphasis on race with little or no examination of race-neutral districting principles.  Particularly disturbing is the testimony regarding the propensity of black voters allegedly to vote only for black candidates:

> Q:     Mr. Gray, you are taking it as a given that in a black majority district, the voters, if you endorse a black candidate because of his race, that the voters should likewise favor the black candidate simply because he is black?
>
> A:     That's probably a fair assessment.
>
> .   .   .   .
>
> Q: [The COURT]:  Under your plan [the plan ultimately adopted by the district court], you're guaranteed three black council persons.
>
> A: [Jerome GRAY]:  Yes.

R6-60; R6- 72.

> Q [Def. Counsel]:  Well, do you agree or disagree that your plan you favor is certainly a form of gerrymandering, with the view of achieving very high majorities of black voters?
>
> A [Singleton, resident of Greensboro]:  I would disagree with you.

6

Q: Well, isn't that its purpose, to achieve and to obtain very high majorities of black voters, in excess of 80 percent, in at least three of the council districts?

A: Sure, it is.

Q: And to do that, you've drawn very specific lines to achieve that purpose?

A: Yes.

R7-36.

Q [The Court]: What is it about this plan that the City has proposed that leads you to believe that in District 2, African-Americans would not have an opportunity to elect a candidate of their choice?

A [Singleton]: Well, I think that in District 2, that the City has not really looked at the majority voting age in that community, and based on the lives [sic] in which it was drawn, we feel that there was not enough people, African-Americans, in that district based on their lines, to successfully elect an African-American in that district.

R7-48-49. This testimony reflects precisely the racially pejorative predisposition that the Supreme Court sought to eradicate in Miller:

When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, "think alike, share the same political interests, and will prefer the same candidates at the polls." . . . Race-based assignments "embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts--their very worth as citizens--according to a criterion barred to the Government by history and the Constitution.

Miller, __ U.S. at __, 115 S. Ct. at 2486 (citations omitted).

The district judge's order adopting Dillard's plan in its entirety also seems to focus on race. Th[e] judge reasons as follows:

Unlike the city's plans, however, the plaintiffs' plan does everything reasonably possible to maximize black voting strength. If the plaintiffs' plan does not conform to § 2 in providing a complete remedy for minority vote dilution and an equal opportunity for minorities to elect candidates of their choice, it is hard to know what would.
                    .    .    .    .
[T]he court notes that it does not base its decision to adopt the plaintiffs' plan on a finding that the Voting Rights Act can only be complied with if black voters choose black candidates. The purpose of § 2 of the Voting Rights Act is not to assure the election of black candidates.

Dillard v. Greensboro, 865 F. Supp. at 778. The judge also expresses a troubling reluctance to draw his o[wn] plan or tailor Dillard's plan at all: "Notwithstanding its preference to avoid drawing a new plan, the court would have to undertake that task if the plan proposed by the plaintiffs was invalid for some reason[.]" Id. at 777. The court's determination that Dillard's redistricting plan is not invalid is manifestly conclusory.

The judge emphasized that the Attorney General remarked that a "black-supported candidate," not a "black candidate," was defeated in District 2. Under Miller, this distinction is not valid because it assumes that all blacks will support the same candidate.[8] Neither the magistrate judge's reports and

_____

[8] We acknowledge that the magistrate judge did express some concern over the issue of compactness and respect for political subdivisions during the 1993 hearing and contiguity was discussed to some extent in the 1992 hearing. See, e.g., R6-17-

recommendations nor the district court's orders reflect an adequate analysis of the testimony or plans wit regard to traditional districting principles. The redistricting plan must be reevaluated by the district court in light of Miller.[9]

C.  Department of Justice Preclearance

The Supreme Court in Miller also criticized the Justice Department's preclearance procedures and found it "inappropriate for a court engaged in constitutional scrutiny to accord deference to the Justice Department's interpretation of the Act." Miller, __ U.S. at __, 115 S. Ct. at 2491. The Court found that the Justice Department had been driven by the objectionable policy of maximizing the number of majority black districts rather than "grounding its objections [to proposed plans] on evidence of a discriminatory purpose." Id. at __, 115 S. Ct. at 2492. "In utilizing § 5 to require States to create majority-minority districts wherever possible, the Department of Justice expanded its authority under the statute beyond wha Congress intended and we have upheld." Id. at __, 115 S. Ct. at 2493.

When a federal court reviews a redistricting plan, it intrudes "on the most vital of local functions" and must accord legislatures the presumption of good faith "until a claimant makes a showing sufficient to support [its] allegation" that the legislature's decisionmaking is race-based. Id. at __, 1 S. Ct. at 2488. The district court made every attempt to defer to the legislature when approving the 1992 and 1993 plans, but the court found itself thwarted at each turn by the Attorney General's rejection of those plans.

Although we acknowledge that the district court in this case must have been frustrated by the Attorney General's rejection of two plans that the court believed to be adequate remedies, the district court's heavy reliance on finding a plan that will satisfy the concerns of the Attorney General conflicts with the admonition of Miller:

_____

18,46, R7-76. In his final order, the district judge concluded that "the plaintiffs' plan does not violate constitutional or statutory standards," but he did not make satisfactory evidentiary findings on this issue. Dillard, 865 F. Supp. at 777.

[9] While neither the magistrate judge nor the district court had the benefit of Miller when evaluating the redistricting plans, the Supreme Court's decision in Shaw was available and should have guided the court's reasoning.

We note that the Supreme Court granted certiorari and heard oral argument in two cases that also may prove to be relevant in the district court's reevaluation of the plan. Shaw v. Hunt, 861 F. Supp. 408 (E.D.N.C. 1994), cert. granted, __ U.S. __, 115 S. Ct. 2639, 132 L. Ed. 2d 878 (1995); Vera v. Richards, 861 F. Supp. 1304 (S.D. Tex. 1994), cert. granted sub. nom. Vera v. Bush, __ U.S. __, 115 S. Ct. 2639, 132 L. Ed. 2d 877 (1995).

8

> [O]rdinarily the court would take seriously concerns about packing minorities into districts.  In this situation, however, the Attorney General objected to a district with a black voting age population of 63% because of, among other factors, "the reduced electoral participation by black persons, which is traceable to a history of discrimination"; therefore, any plan the court adopts to cure that objection will necessarily contain districts with a great many blacks.

Dillard, 865 F. Supp. at 778.  From the district court's order, it is difficult to infer anything other th that the purpose of adopting Dillard's plan was to satisfy the Attorney General.

### III.  CONCLUSION

In this appeal, Greensboro challenges the district court's adoption of Dillard's redistricting plan which it contends is racially configured to guarantee the election of black-supported candidates.  If the district court determines that race was the predominant factor in Dillard's redistricting plan, then Mille requires that the plan be subjected to strict scrutiny.  For a redistricting plan to withstand strict scrutiny under the Voting Rights Act, the racially gerrymandered districts must be found to be narrowly tailored to achieve a compelling interest.  Miller, __ U.S. at __, 115 S. Ct. at 2491.  We emphasize that are not expressing any opinion as to whether the Dillard plan ultimately will meet the requirements of the Equal Protection Clause.  Our decision is limited to the conclusion that because neither the magistrate judge nor the district court had the benefit of Miller with its reiteration of the importance of examining principles of compactness, contiguity, and respect for political subdivisions in analyzing the redistricti plan, it is necessary to remand the case.

We VACATE the decision of the district court and REMAND this case for a reevaluation of the propose redistricting plans in light of  Miller.

9