**John DILLARD, et al., Plaintiffs,**

v.

**CITY OF GREENSBORO, Defendant.**

**Civil Action No. 87–T–1223–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Dec. 3, 1996.

Richard Gervase, Washington, DC, Special Master.

James U. Blacksher, Birmingham, AL, Pamela Karlan, University of Virginia School of Law, Charlottesville, VA, Elaine R. Jones, Norman J. Chachkin, Jacqueline A. Berrien, NAACP Legal Defense Fund, New York City, Edward Still, Birmingham, AL, for John Dillard, Damascus Crittenden, Jr., Earwen Ferrell, Clarence J. Jarrells, Ullysses McBride, Louis Hall, Jr.

James U. Blacksher, Birmingham, AL, Elaine R. Jones, Norman J. Chachkin, Jacqueline A. Berrien, NAACP Legal Defense Fund, New York City, Edward Still, Birmingham, AL, for Bobby Singleton, Teresa Burroughs, J.S. Thomas, Mamie Kennedy.

Richard H. Gill, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL, Nicholas H. Cobbs, Jr., Greensboro, AL, David R. Boyd, Balch & Bingham, Montgomery, AL, Mortimer Parker Ames, III, James H. Evans, Office of the Attorney General, Montgomery, AL, for City of Greensboro.

*ORDER*

MYRON H. THOMPSON, Chief Judge.

On October 11, 1994, in this lawsuit brought by plaintiffs, a group of African–Americans, against defendant City of Greensboro, Alabama, this court issued an opinion and injunction requiring that the city employ the plaintiffs' proposed districting plan to remedy an admitted violation of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973. *Dillard v. City of Greensboro,* 865 F.Supp. 773 (M.D.Ala.1994). On January 3, 1996, the Eleventh Circuit Court of Appeals vacated the October 1994 injunction and remanded this case "for a reevaluation of the proposed redistricting plans in light of *Miller [v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ]," an opinion that had been recently issued by the United States Supreme Court. *Dillard v. City of Greensboro,* 74 F.3d 230, 236 (11th Cir.1996). This lawsuit is now before the court on remand from the appellate court.

After remand and a supplemental hearing held on October 17 and 18, 1996, and by agreement of the parties, the court entered an order on November 7, 1996, appointing Honorable Richard M. Gervase as "a Special Master to recommend to the court a redistricting plan for the City of Greensboro." Special Master Gervase was "directed to review the record and the transcripts in this litigation, including all previous reapportionment plans submitted to the court, whether approved or not." The court further stated that "the Special Master will be furnished by the court with explicit instructions on the legal standards and criteria to be used in drawing up a districting plan, and the Special Master is bound to follow these directions of the court."

Pursuant to the order of November 7, 1996, the court now provides the following legal standards and criteria to be used by the Special Master in drawing up a districting plan for the City of Greensboro:

*I. SECTION 2 CLAIM*

Subsection (a) of § 2 provides that no State or political subdivision may impose or

apply a voting qualification or prerequisite to voting or any standard, practice, or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C.A § 1973(a). "A violation is established," according to subsection (b), "if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C.A. § 1973(b).

The Supreme Court set forth in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the manner in which a trial court should assess a § 2 results claim. In *Dillard v. Baldwin County Board of Education,* 686 F.Supp 1459, 1469 (M.D.Ala. 1988), and *Dillard v. Baldwin County Commission,* 694 F.Supp. 836, 840 (M.D.Ala.), *amended,* 701 F.Supp. 808 (M.D.Ala.), *aff'd,* 862 F.2d 878 (11th Cir.1988) (table), this court summarized its understanding of the *Gingles'* requirements as follows:

● The *Gingles* Court listed nine Congressional factors typically considered in evaluating a results claim.[1] The Court observed that the compilation of these factors is premised on the notion "that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representative." 478

U.S. at 47, 106 S.Ct. at 2764–65. According to the Court, however, there is one significant limit on a results claim. A minority group has no right under § 2 to proportional representation: "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation." *Id.* at 46, 106 S.Ct. at 2764. Rather, as stated, the minority must show that, under the totality of circumstances, the challenged electoral scheme results in unequal access to the electoral process.

● The *Gingles* Court then refined the above general observations to address the specific type of governmental decision being challenged: the decision of a government to employ, in the face of a majority-vote requirement, at-large districting rather than single-member districts with one or more majority-black districts. *Id.* at 45, 106 S.Ct. at 2764. The Court held that while all nine of the Congressional factors typically considered remain relevant, two circumstances are more important, and indeed are essential, to success on this challenge. *Id.* at 48–50 & ns. 15 & 16, 106 S.Ct. at 2765–67 & ns. 15 & 16.

● The Court required, as a first "precondition" to such a challenge, that the minority must be able to show that it experiences substantial difficulty electing representatives of its choice. To do this it must show the existence of "racially polarized voting": first, that the minority group constitutes a politically cohesive unit and, second, that the white majority votes sufficiently as a bloc, usually to defeat the minority's pre-

---

1. These factors are: (1) the extent of any history of official discrimination in the State or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the State or political subdivision is racially polarized; (3) the extent to which the State or political subdivision has used unusually large election districts, majority vote requirements, anti–single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the

State or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the State or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2759–60.

ferred candidate. *Id.* at 52, 54, 106 S.Ct. at 2767, 2769. If the minority group is not politically cohesive, it cannot be said that distinctive minority group interests are being thwarted, *id.;* and without significant white bloc voting, usually to defeat minority preferences, it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. *Id.* at 48 n. 15, 106 S.Ct. at 2766 n. 15. Indeed, for these reasons, racially polarized voting is viewed as the key element of a vote dilution claim.[2] *Id.* at 30, 106 S.Ct. at 2769.

● The Court required, as a second precondition, that the minority be able to demonstrate that its difficulty in electing candidates of its choice is in some measure attributable to the challenged election feature, *id.* at 48, 106 S.Ct. at 2765, or, to put it another way, that the minority has the potential to elect representatives in the absence of the challenged feature. *Id.* at 50–51 & n. 17, 106 S.Ct. at 2766–67 & n. 17. Because the questioned choice in *Gingles* was in the context of a majority-vote requirement and because it was between an at-large system and a scheme with a majority-black single-member district, the Court logically required that "the minority group ... be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766. As the Court explained, "If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates." *Id.* (emphasis in original) (footnotes omitted). In effect, therefore, under *Gingles,* if a minority seeks to require that a jurisdiction with a majority-vote requirement adopt single-member districts with one or more majority-black districts, the minority must be able to show in the liability phase of its case that the remedy of a majority-black single-member district is in

"actuality possible," *Baldwin County Commission,* 694 F.Supp. at 840, or that, as later put by Justice O'Connor, the minority must be able to point to a "hypothetical district" in which it is sufficiently large and geographically compact to constitute a majority in a single-member district. *Bush v. Vera,* —— U.S. ——, ——, 116 S.Ct. 1941, 1970, 135 L.Ed.2d 248 (1996) (O'Connor, J., concurring); *Clark v. Calhoun County,* 88 F.3d 1393, 1408 (5th Cir.1996).

● Upon a finding of a violation of § 2, the trial court must fashion a remedy that "itself satisfies section 2. *Dillard v. Crenshaw County,* 831 F.2d [246,] 249 [ (11th Cir.1987) ]." *Greensboro,* 74 F.3d at 233. Congress has made clear that, in effecting this role, a "court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep.No. 417, 97th Cong.2nd Sess. 31, reprinted in 1982 U.S.C.C.A.N. 177, 208. The remedy must, therefore, "completely" and "with certitude" cure the § 2 violation. *Crenshaw County,* 831 F.2d at 249.

## II. EQUAL PROTECTION CLAUSE CONSIDERATION

██ Although the Special Master has a commitment to remedy fully the § 2 violation, "that commitment can and must be reconciled with the complementary commitment of our Fourteenth Amendment jurisprudence to eliminate the unjustified use of racial stereotypes." *Bush,* —— U.S. at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring). The equal protection clause of the fourteenth amendment places the following constraints on any remedy fashioned by the Special Master:

● So long as the Special Master does not subordinate traditional districting criteria

---

**2.** "It cannot also be overlooked that racially polarized voting not only deprives minority voters of their preferred representatives, it also leaves them effectively unrepresented because it allows those elected to ignore minority interest without fear of political consequences." *Baldwin County*

*Commission,* 694 F.Supp. at 841 (citing *Gingles,* 478 U.S. at 48 n. 14, 106 S.Ct. at 2765 n. 14). "In a very real sense, therefore, racially polarized voting perpetuates the effects of past discrimination." *Id.* (citing *Gingles,* 478 U.S. at 44 n. 9, 106 S.Ct. at 2763 n. 9).

to the use of race for its own sake or as a proxy, he may intentionally create majority–African–American districts, and may otherwise take race into consideration, without coming under strict scrutiny. *Bush,* —— U.S. at ——, 116 S.Ct. at 1951–1952 (plurality opinion); *id.* at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring); *id.* at ——, —— & n. 8, 116 S.Ct. at 1976–1978 & n. 8, 1985 (Stevens, J., joined by Ginsburg and Breyer, JJ., dissenting); *id.* at ——, ——, ——, 116 S.Ct. at 2003, 2007, 2011 (Souter, J., joined by Ginsburg and Breyer, JJ., dissenting). "For strict scrutiny to apply, the plaintiffs must prove that other, legitimate districting principles were 'subordinated' to race," *Bush,* —— U.S. at ——, 116 S.Ct. at 1951 (plurality opinion), that is, "race must be '*the predominant* factor motivating the ... [redistricting] decision.'" *Id.* at ——, 116 S.Ct. at 1952 (quoting *Miller,* —— U.S. at ——, 115 S.Ct. at 2488 (emphasis added)). "Only if traditional districting criteria are neglected *and* that neglect is predominantly due to the misuse of race does strict scrutiny apply." *Bush,* —— U.S. at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring) (emphasis in original). To survive strict scrutiny, "the plan must be ... narrowly tailored to achieve a compelling state interest. This test will be satisfied if evidence of past discrimination is shown and there is a sufficient evidentiary basis to establish that the plan is narrowly tailored to remedy that discrimination." *Greensboro,* 74 F.3d at 234 (citing *Miller,* —— U.S. at ——, 115 S.Ct. at 2491).

● "[T]he state interest in avoiding liability under ... § 2 is compelling." *Bush,* —— U.S. at ——, 116 S.Ct. at 1970 (O'Connor, J., concurring) (citing *White v. Alabama,* 867 F.Supp. 1519, 1549 (M.D.Ala. 1994) (Thompson, J.) (the results test "has not been held unconstitutional and complying with it remains a strong state interest"), *vacated and remanded on other grounds,* 74 F.3d 1058, 1069 (11th Cir. 1996)); *see also id.* at ——, 116 S.Ct. at 1989 (Stevens, J., joined by Ginsburg and Breyer, JJ., dissenting); *id.* at ——, 116 S.Ct. at 2007 (Souter, J., joined by Ginsburg and Breyer, JJ., dissenting).

● If the Special Master "pursues that compelling interest by creating a district that 'substantially addresses' the [§ 2] liability, ... and does not deviate substantially from a hypothetical ... § 2 district for predominantly racial reasons, ... [his] districting plan will be deemed narrowly tailored." *Bush,* —— U.S. at ——, 116 S.Ct. at 1970 (O'Connor, J., concurring).

● Finally, the narrow tailoring requirement does not demand that the plan drawn by the Special Master "have the least possible amount of irregularity in shape, making allowances for traditional districting criteria." *Bush,* —— U.S. at ——, 116 S.Ct. at 1960 (plurality opinion) (quotations omitted). "A § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts ... in endless 'beauty contests.'" *Id.* (emphasis in original). In other words, the fourteenth amendment allows the Special Master "leeway," *id.,* albeit only "a limited" one, *id.,* in curing the § 2 violation.

## III. CITY'S ADMISSION OF LIABILITY

▇ As noted by the Eleventh Circuit, "[p]ursuant to a 1987 consent decree, Greensboro conceded that its at-large system violated section 2 of the Voting Rights Act." *Greensboro,* 74 F.3d at 231. In other words, the city has conceded that the *Gingles* factors have been satisfied—that is, that, "based on the totality of the circumstances, ... the [city's] political processes ... are not equally open to participation by [African–Americans] in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C.A. § 1973(b). More specifically, the city has conceded that there is racially polarized voting (that the city's African–Americans constitute a politically cohesive unit and that the white citizens vote sufficiently as a bloc, usually to defeat the African–Americans' preferred candidate) and that the group is sufficiently large and geographically compact to

constitute a majority in a single-member district. Therefore, any plan to redistrict the city and remedy this violation must reflect a § 2 commitment to cure the violation "completely" and "with certitude," *Crenshaw County,* 831 F.2d at 249, as well as a "complementary commitment" under the fourteenth amendment to do so without "the unjustified use of racial stereotypes." *Bush,* —— U.S. at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring).

## IV. PROCEDURES FOR DRAFTING PROPOSED DISTRICTING PLAN

In early recognition of the concern that judicial oversight of districting and redistricting "represents a serious intrusion on the most vital of local functions," *Miller,* —— U.S. at ——, 115 S.Ct. at 2488, this court has repeatedly stated and emphasized that "any court remedy [for a § 2 violation] must … include only those measures necessary to cure the defect." *Baldwin County Board of Education,* 686 F.Supp at 1469. Toward this end and in an effort to comply with both the letter and spirit of recent holdings from the Supreme Court, this court has today fashioned a three-stage procedure. The Special Master should follow this procedure.

### Stage One

■■■ First and obviously, the electoral districts must be of very nearly equal population to satisfy the "one person, one vote" principle of the equal protection clause of the fourteenth amendment to the United States Constitution. "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts … as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964). A reapportionment plan fashioned by the court must conform even more strictly to this standard than a legislative plan. *Chapman v. Meier,* 420 U.S. 1, 26, 95 S.Ct. 751, 765, 42 L.Ed.2d 766 (1977). The parties in this action have consistently drawn their proposed plans to allow for a maximum 5% plus or minus (or total 10%) population variation, and now further agree that the plan to be recommended by the Special Master may allow for deviations of no greater than 5% among districts.

■■■ Second, any redistricting plan must take into consideration "traditional race-neutral districting principles." *Miller,* —— U.S. at ——, 115 S.Ct. at 2488. These principles "includ[e] but [are] not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests." *Id.* Implicit in this observation is the directive that a trial court not only respect the traditional principles of compactness, contiguity, and respect for political subdivisions, but that it also canvass State law, practice, and custom for other traditional race-neutral principles. This court's search of Alabama law reveals that the State follows the traditional concepts of compactness, contiguity, and respect for political subdivisions or communities, with one addition: district boundary lines should follow the center lines of streets or other well-defined boundaries.[3]

---

3. The Alabama Code classifies all cities and towns with a population of 5,999 inhabitants or fewer as "Class 8" municipal corporations. 1975 Ala.Code § 11–40–12(a). The City of Greensboro has a total population of fewer than 5,999 and is therefore a Class 8 city. Chapter 11–43(A) of the 1975 Alabama Code applies to all Class 8 municipal corporations. Although the chapter specifically addresses electing a council-manager form of government and does not mention redistricting for single-member districts, the chapter does refer to principles of reapportionment. In addition, other chapters of the Code applicable to other classes of cities, and dealing with organization of various forms of municipal government, invoke districting principles. These principles are as follows: (i) each district shall be formed of contiguous and to the extent reasonably possible, compact territory, and its boundary lines shall be the center lines of streets or other well-defined boundaries; and (ii) each district shall contain as nearly as is possible the same population. § 11–43A–33(1). In addition, according to § 11–44F–1, if a court has found a Class 8 municipality's at-large voting system to be in violation of the federal Voting Rights Act, the municipality may adopt a mayor-council form of government, with the mayor elected at large and a five-member council elected from single-member districts. The single-member districts must be "of nearly equal population." The boundaries between districts, according to § 11–44F–2, "shall be the centerline of streets or other well-defined boundaries."

Because, as stated, court-ordered districting is "a serious intrusion on the most vital of local functions," *Miller*, —— U.S. at ——, 115 S.Ct. at 2488, the Special Master should begin his attempt to redress the § 2 violation by showing, to the extent reasonably possible, deference to those State districting principles that are legally permissible. As shown above, Alabama statutory law reflects that State districting plans should abide by traditional districting principles; State law does not reflect that race should be a factor. The Special Master should, therefore, be motivated by, and begin with, these principles in drafting his districting plan. If these principles prove adequate to redress the § 2 violation, the Special Master should go no further.

To be sure, the Fifth Circuit Court of Appeals has stated that "Redistricting to remedy found violations of § 2 of the Voting Rights Act by definition employs race." *Clark v. Calhoun County*, 88 F.3d 1393, 1408 (5th Cir.1996). Similarly, the Tenth Circuit Court of Appeals has observed that "adherence to *Gingles* to remedy violations of § 2 necessarily implicates race." *Sanchez v. State of Colorado*, 97 F.3d 1303, 1327 (10th Cir.1996). *See also id.* at 1326 ("Surely, all voting rights cases are premised on minority status and, necessarily, seek some 'special' treatment of minority voters."). To the extent these appellate courts are suggesting that race must perforce be a motivating factor in the initial and actual fashioning of a districting plan, their generalizations are probably often true but *not necessarily so.* In fact, Greensboro may be an example of a community where, through the utilization of traditional race-neutral principles, a full cure can be fashioned. The plaintiffs prefaced their agreement to the appointment of a special master on the argument that "any districting plan for Greensboro which employs good districting principles, such as the 'principles of compactness, contiguity, and respect for political subdivisions,' ... will produce at least three districts with black populations in excess of 70%, and ... any plan which attempts to accomplish defendant's race-conscious objectives must violate those same good districting principles." [4] And the United States Department of Justice suggested as much as well when, in rejecting the city's proposed districting plans, it voiced a concern that the city may have "improperly 'fragmented black population concentrations in order to lower the black percentage in District 2.'" *Greensboro*, 865 F.Supp. at 774 (quoting Letter from the United States Attorney General, dated December 4, 1992, and filed with the court on January 4, 1993, at 2). *Cf. also Buskey v. Oliver*, 565 F.Supp. 1473, 1483 (M.D.Ala.1983) (§ 2 violation established where city decreased black population in district for racially-discriminatory purpose).

On the other hand, to the extent the Fifth and Tenth Circuits are suggesting that "traditional race-neutral principles" cannot, in fact, exist apart from racial considerations, the court agrees. A finding of a § 2 violation in favor of African–Americans would perforce reflect that the group is not only geographically compact (a condition which arguably, but perhaps only theoretically, could be explained for reasons other than race) but that this condition is directly and causally related to the fact that the minority group constitutes a politically cohesive unit and the white majority votes sufficiently as a bloc, usually to defeat the minority's preferred candidate, *Gingles*, 478 U.S. at 52, 54, 106 S.Ct. at 2767, 2769, and is directly and causally related to some of the following other racially adverse social and historical conditions: that there is a history of official discrimination in the State or political subdivision that touched the right of the members of the group to register, to vote, or otherwise to participate in the democratic process; that the members of the minority group continue to bear the effects of discrimination in such areas as housing, education, employment, and health, which hinder

---

Other Alabama Code sections applicable to other classes of cities mention that deviation in district populations should be "not more than five per centum more or less than the average." § 11–44A–6. *See also, e.g.,* §§ 11–44B–10(b)(1)b, 11–44D–8(1)b.

4. Plaintiffs' post-trial proposed findings of fact and conclusions of law, filed on October 29, 1996, at 3.

their ability to participate effectively in the political process; that political campaigns have been characterized by overt or subtle racial appeals; that few members of the group have been elected to public office in the jurisdiction; and that there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. Therefore, it would be expected that community boundaries and interests would be strongly influenced, if not defined, by race considerations, because racial considerations, in fact, influenced and defined community boundaries and interests.

Therefore, by use of the term 'traditional race-neutral principles', the court should not be understood to require that the Special Master ignore the social, political, and historical conditions brought about by race that exist currently and as a result of social and historical conditions in the community, and that are reflected in the neighborhoods, other natural boundaries, and the shared interests in the community. Rather, the applicable districting principles should be viewed as race-neutral, and followed as such, in the sense that the principles themselves have no racial content or bias, and thus to the extent racial features surface in the plan fashioned by the Special Master they would do so because of corresponding racial conditions in the community, and not because of any racial bias in the districting principles themselves. In other words, the principles are race-neutral because, although they may take note of and even reflect racial conditions, they are not racially-biased themselves.

In addition, to the extent the Fifth and Tenth Circuits meant that any product (even one fashioned solely with race-neutral principles) must be ultimately tested by whether it cures the § 2 violation, the court agrees that race will always be a factor, for the ultimate question is whether the proposed plan provides the complaining *racial* group (in this case, African–Americans) equal access to the political process within the context of § 2.

Therefore, at stage one, the Special Master is instructed to endeavor to fashion a plan that cures the § 2 violation solely through the application of race-neutral traditional districting principles.

### Stage Two

However, if to cure the § 2 violation the Special Master finds that he must employ race as a factor in the actual fashioning of a plan, he may do so, but he should first attempt to see if a plan can be drawn in which race is not the dominant factor. The fourteenth amendment is not implicated and "[s]trict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominate[ ] over racial ones." *Bush,* —— U.S. at ——, 116 S.Ct. at 1954 (plurality opinion). This instruction to the Special Master raises the important, but elusive, question of when race is a predominant factor and when it is not. The dictionary definition of predominant is "holding an ascendency," and "having superior strength, influence, authority, or position." Webster's Third New International Dictionary at 1786 (1976). The term predominant is therefore a relative term, in that whether something is predominant depends on its position in relation to that of other considered factors. Race would, obviously, be considered predominant "if traditional districting criteria are neglected *and* that neglect is predominantly due to the misuse of race." *Bush,* —— U.S. at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring) (emphasis in original). Race is also predominant if traditional race-neutral criteria are "subordinated" to it. *Id.* The court recognizes that the determination of whether race is predominant or subordinate is easier said than done, but it must be done. Regrettably, in the meeting between § 2 and the equal protection clause, "bright-line rules are not available." *Id.* at ——, 116 S.Ct. at 1964 (plurality opinion).

### Stage Three

Finally, if in order to cure the § 2 violation the Special Master must not only consider race but must give it dominant consideration, the Special Master's plan must be narrowly tailored to cure the § 2 violation. As stated, strict scrutiny applies if race is "*the predominant* factor motivating the . . . [redistricting] decision.'" *Bush,* —— U.S. at

——, 116 S.Ct. at 1952 (quoting *Miller,* —— U.S. at ——, 115 S.Ct. at 2488 (emphasis added)). To survive strict scrutiny, "the plan must be . . . narrowly tailored to achieve a compelling state interest," *Greensboro,* 74 F.3d at 234, and "the state interest in avoiding liability under . . . § 2 is compelling." *Bush,* —— U.S. at ——, 116 S.Ct. at 1970 (O'Connor, J., concurring). Therefore, if the Special Master "pursues that compelling interest by creating a district that 'substantially addresses' the [§ 2] liability, . . . and does not deviate substantially from a hypothetical . . . § 2 district for predominantly racial reasons, . . . [his] districting plan will be deemed narrowly tailored." *Id.* at ——, 116 S.Ct. at 1970 (O'Connor, J., concurring).

At first blush, it might appear that the strict scrutiny concept is without real substance. *Cf. Bush,* —— U.S. at ——, 116 S.Ct. at 1978 (Stevens, J., dissenting) ("we apply 'strict scrutiny' more to describe the likelihood of success than the character of the test to be applied"). This would be true if strict scrutiny's narrow-tailoring requirement were equated to the requirement that a plan comply with, and not subordinate to race, all traditional race-neutral principles, for then the requirement that the plan failed to meet in triggering strict scrutiny (that the plan comply with all traditional race-neutral principles) would be the same as the requirement needed to satisfy that scrutiny (narrow tailoring).

■■■ However, it does not appear that the narrow-tailoring requirement means that the plan must satisfy all traditional race-neutral principles. As stated, to establish liability under a § 2, the complaining group must be able to point to a "hypothetical district" in which it is sufficiently large and geographically compact to constitute a majority in a single-member district. Because the State has a compelling interest only in remedying the § 2 violation, a plan would be narrowly tailored and thus survive strict scrutiny only if it " 'substantially addresses' the [§ 2] liability, . . . and does not deviate substantially from a hypothetical . . . § 2 district for predominantly racial reasons." *Bush,* —— U.S. at ——, 116 S.Ct. at 1970 (O'Connor, J.,

concurring). This could be true even though the plan failed to comply with any, or all, of the other traditional race-neutral principles. In other words, with the exception of § 2's requirement of compactness, traditional race-neutral principles can be subordinated or even sacrificed in favor of race considerations to the extent necessary to remedy the § 2 violation.[5]

■■■ Nevertheless, "[w]hile § 2 does not require a noncompact majority-minority district, neither does it forbid it, provided that the rationale for creating it is proper in the first instance. Districts not drawn for impermissible reasons or according to impermissible criteria may take any shape, even a bizarre one." *Bush,* —— U.S. at ——, 116 S.Ct. at 1972 (Kennedy, J., concurring). It is not impermissible to "tak[e] into account race-neutral factors in drawing permissible majority-minority districts." *Id.* Therefore, a plan that fully remedied a § 2 violation but deviated from the "hypothetical § 2 plan" for *non-racial reasons* would not run afoul of either § 2 or the fourteenth amendment. *See id.* at ——, 116 S.Ct. at 1971 (Kennedy, J., concurring) ("The first Gingles condition refers to the compactness of the minority population, not to the compactness of the contested district."); *see also id.* at ——, 116 S.Ct. at 1971 (Thomas, J., joined by Scalia, J., concurring) ("[T]he intentional creation of a majority-minority district certainly means more than mere awareness that application of traditional, race-neutral districting principles will result in the creation of a district in which a majority of the district's residents are members of a particular minority group . . . . In my view, it means that the legislature affirmatively undertakes to create a majority-minority district that would not have existed but for the express use of racial classifications—in other words, that a majority-minority district is created 'because of,' and not merely 'in spite of,' racial demographics.") (citations omitted).

Accordingly, pursuant to the *order* entered on November 7, 1996, it is further ORDERED that Special Master Richard M. Gervase shall take notice of and abide by the

---

5. Of course, the "one-person, one-vote" principle cannot be compromised either.

above statements and conclusions of law in fashioning a districting plan for the City of Greensboro.