John DILLARD, et al., Plaintiffs,

v.

CITY OF GREENSBORO, Defendant.

Civil Action No. 87–T–1223–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 26, 1997.

James U. Blacksher, Birmingham, AL, Pamela Karlan, University of Virginia School of Law, Charlottesville, VA, Elaine R. Jones, Norman J. Chachkin, Jacqueline A. Berrien, NAACP Legal Defense Fund, New York City, Edward Still, Birmingham, AL, for John Dillard, Damascus Crittenden, Jr., Earwen Ferrell, Clarence J. Jarrells, Ullysses McBride, Louis Hall, Jr., J.S. Thomas, Mamie Kennedy, Bobby Singleton and Teresa Burroughs.

Richard H. Gill, Copeland, Franco, Screws & Gill, Montgomery, AL, Nicholas H. Cobbs, Jr., Greensboro, AL, David R. Boyd, Balch & Bingham, Montgomery, AL, Mortimer Parker Ames, III, James H. Evans, Office of the Atty. Gen., Montgomery, AL, for City of Greensboro.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

This ten-year-old lawsuit, brought by plaintiffs, African–American citizens of defendant City of Greensboro, Alabama, claiming that the at-large system used by the city to elect its city council members violated § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973, appears to have reached a long-sought end. This lawsuit is now before the court on the Special Master Richard M. Gervase's reports and recommendation of Plan B for redistricting the city. The plan, according to the Special Master, will "completely remedy" the city's admitted § 2 violation.[1] After careful review of the record, the court agrees with the Special Master and now adopts his reports and his recommendation of Plan B.

## I. BACKGROUND

The entire history of this case is well documented, and can be reviewed in some detail, in the following published opinions: *Dillard v. City of Greensboro*, 74 F.3d 230 (11th Cir.1996), *Dillard v. City of Greensboro*, 865 F.Supp. 773 (M.D.Ala.1994), and *Dillard v.*

---

1. Special Master's supplemental report and rec-    ommendation filed on February 5, 1997, at 15.

*City of Greensboro,* 946 F.Supp. 946 (M.D.Ala.1996). The relevant recent background is as follows:

● On October 11, 1994, the court adopted plaintiffs' proposed single-member districting plan as a remedy for the City of Greensboro's admitted violation of § 2. *Greensboro,* 865 F.Supp. at 779–80.

● After appeal by the city, the Eleventh Circuit Court of Appeals remanded the case to this court so that the new plan and other proposed plans could be reexamined in light of *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), a Supreme Court decision issued subsequent to the October 1994 redistricting order. *Greensboro,* 74 F.3d at 236.

● Upon remand and after a supplemental hearing held on October 17 and 18, 1996, and by agreement of the parties, the court entered an order on November 7, 1996, appointing Honorable Richard M. Gervase as "a Special Master to recommend to the court a redistricting plan for the City of Greensboro." Special Master Gervase was "directed to review the record and the transcripts in this litigation, including all previous reapportionment plans submitted to the court, whether approved or not." The court further stated that "the Special Master will be furnished by the court with explicit instructions on the legal standards and criteria to be used in drawing up a districting plan, and the Special Master is bound to follow these directions of the court."

● Pursuant to the order of November 7, 1996, the court issued an order on December 3, 1996, defining and explaining the legal standards and criteria to be used by the Special Master in drawing up a redistricting plan for the City of Greensboro. *Greensboro,* 946 F.Supp. at 953–57.

● On January 3, 1997, the Special Master filed his initial report. He recommended that the court adopt Plan A, which he had crafted to cure the § 2 violation. The court then gave the parties an opportunity to consider the report and Plan A and to lodge any objections to them.

● The City of Greensboro objected to Plan A on January 10, 1997, and suggested specific changes in the plan. The city disapproved of the recommended plan because it would have the incidental effect of requiring pairs of incumbent council members to run against each other in two different districts. Thus, the city raised, for the first time in this action, the issue of whether protection of incumbents is a legitimate and traditional districting factor for the court to consider in adopting a redistricting plan to cure a § 2 violation.

● After re-submission of the matter to the Special Master and after the parties had had an opportunity to brief the new issue, the Special Master submitted a supplemental report on February 5, 1997, and recommended that the court adopt Plan B instead of Plan A. The court gave the parties an opportunity to file objections to this supplemental report and plan as well. No objections were filed.

## II.  DISCUSSION

### A.

In its order of December 3, 1996, the court furnished the Special Master with explicit instructions on the legal standards and criteria to be used in drawing up a redistricting plan and directed the Special Master to adhere closely to those instructions. *Greensboro,* 946 F.Supp. at 953–57. The court emphasized two main points of law.

First, the court addressed § 2. The court wrote that, "Subsection (a) of § 2 provides that no State or political subdivision may impose or apply a voting qualification or prerequisite to voting or any standard, practice, or procedure that 'results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.' 42 U.S.C.A. § 1973(a). 'A violation is established,' according to subsection (b), 'if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.' 42 U.S.C.A.

§ 1973(b)." *Id.* at 949–50. The court then elaborated upon the nature of a § 2 claim, drawing from among several of the many opinions and decisions it has produced over the long course of related voting rights litigation in this district.[2] *Id.* at 950–51. The court then concluded that, in fashioning a redistricting plan that remedies the acknowledged § 2 violation under the at-large voting system that existed in the City of Greensboro prior to the commencement of this litigation, the Special Master had to develop a plan that "*fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice.' S.Rep.No. 417, 97th Cong.2nd Sess. 31, reprinted in 1982 U.S.C.C.A.N. 177, 208." *Id.* at 951 (emphasis added).

The court next instructed the Special Master that not only does the "one-person, one-vote" principle of the equal protection clause require equalization of the populations in each district as nearly as is practicable, *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964), but also that very recent Supreme Court voting rights cases dictate that any voter classification that is based upon or emphasizes race, no matter how conspicuously benign the racial consideration, is to be considered suspect and thus subject to strict scrutiny *if* it subordinates traditional districting criteria. *Greensboro,* 946 F.Supp. at 951–52. *See also Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). The court acknowledged, however, that, because any § 2 remedial plan "(even one fashioned solely with race-neutral principles) must be ultimately tested by whether it cures the § 2 violation, . . . race will always be a factor, for the ultimate question is whether the proposed plan provides the complaining *racial* group (in this case, African–Americans) equal access to the political process within the context of § 2." *Greensboro,* 946 F.Supp. at 955.

The court reconciled these somewhat countervailing voting rights and equal protection principles by constructing a three-stage model. In stage one, the Special Master was "instructed to endeavor to fashion a plan that cures the § 2 violation solely through the application of race-neutral traditional districting principles." *Id.* If, at this stage, the Special Master can serendipitously yet fully address the § 2 violation, solely through application of "traditional, race-neutral districting principles, including but not limited to compactness, contiguity, [and] respect for political subdivisions or communities defined by actual shared interests," *Miller,* —— U.S. at ——, 115 S.Ct. at 2488, he "should go no further." *Greensboro,* 946 F.Supp. at 954. "However, if to cure the § 2 violation the Special Master finds that he must employ race as a factor in the actual fashioning of a plan," he must go to stage two. *Id.* at 955. At this stage, he may employ race as a factor, "but he should first attempt to see if a plan can be drawn in which race is not the dominant factor." *Id.* The court explained that the "fourteenth amendment is not implicated and '[s]trict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominate[ ] over racial ones.' " *Id.* (quoting *Bush,* —— U.S. at ——, 116 S.Ct. at 1954 (plurality opinion)). "Finally, if in order to cure the § 2 violation the Special Master must not only consider race but must give it dominant consideration," he must go to stage three. *Id.* At this stage, he may employ race as a dominant factor in fashioning a plan, but the "plan must be narrowly tailored to cure the § 2 violation." *Id.* "As stated, strict scrutiny applies if race is the 'the *predominant* factor motivating the . . . [redistricting] decision.' " *Id.* at 955–56 (quoting *Miller,* —— U.S. at ——, 115 S.Ct. at 2488) (emphasis added). "To survive strict scrutiny," the court continued, " 'the plan must be . . . narrowly tailored to achieve a compelling state interest.' " *Id.* at 956 (quoting *Greensboro,* 74 F.3d at 234).

## B.

With these instructions in mind, the Special Master states that he "reviewed the en-

---

**2.** The court traced the evolution of these cases in some detail in *Dillard v. Baldwin County Bd. of*

*Educ.,* 686 F.Supp. 1459, 1461 (M.D.Ala.1988).

tire record and transcripts [of all hearings] in this litigation, including all previous reapportionment plans submitted to the court, without making any presumptions as to the correctness or appropriateness of any of the previously submitted plans."[3]  The Special Master then "conducted an on-site assessment of the geographical and social boundaries and neighborhoods" of the City of Greensboro.[4]  He then used the data and equipment at the State Reapportionment Office in Montgomery, Alabama to draft a redistricting plan.

The Special Master "began with the Court's 'stage one' analysis and did not, therefore, consider race as a factor in evaluating district boundaries."[5]  Rather, in his words, he worked exclusively with the traditional districting principles of " 'equinumerosity,' a requirement that each district's population not deviate more than five percent, plus or minus, from the 'ideal' district population ... [along with] compactness, contiguity, respect for political subdivisions or communities of shared interests, and the use of center lines of streets or other well-defined boundaries as district lines."[6]

After reviewing all plans previously submitted to the court by the parties, the Special Master concluded that none of them sufficiently conformed to stage one's program of observance of traditional districting criteria to the exclusion of race, and therefore none among them warranted endorsement at this stage.[7]  However, he found that "application of traditional districting principles at stage one .... produce[d] at least one redistricting plan that cures the § 2 violation 'completely' and 'with certitude,' *Dillard v. Crenshaw County*, 831 F.2d 246, 249 (11th Cir.1987)."[8]  In fact, as the Special Master explained, "because of the percentage of minorities in living in Greensboro—in excess of 62%—and the substantial segregation that exists, [he] was able to draft several plans based on traditional districting criteria and each would have cured the § 2 violation if implemented."[9]  Given this conclusion, the Special Master heeded the court's instructions and went no further.  He stated that "no stage two or stage three inquiries were necessary under the facts of this case."[10]

In order to produce a plan that best applies traditional districting criteria to the geography and demographics of the City of Greensboro, the Special Master "endeavored first to define and protect 'communities of interest.' "[11]  However, "[b]ecause of [the City of] Greensboro's relatively small population, ... district-size communities of interest or neighborhoods, as may be understood in larger cities, do not generally exist."[12]  Public schools, churches, parks and other recreational facilities, and commercial and retail facilities are "not geographically restricted" but rather draw from the entire city, if not the county.[13]  "To the extent Greensboro has separate communities of interest, they are generally at the block or subdivision level."[14]  Therefore, the Special Master looked next to existing dividing lines and physical boundaries, such as highways and main thoroughfares, and used these to bound and protect "each of the neighborhoods or communities of interest" he was able to identify.[15]  Where the Special Master could not rely entirely on highways and thoroughfares to form district boundaries, it was because of the demands and constraints placed upon his drafting hand by other traditional concerns, such as

---

3.  Special Master's initial report and recommendation filed on January 3, 1997, at 1.

4.  *Id.* at 1–2.

5.  *Id.* at 2.

6.  *Id.*

7.  *Id.*

8.  *Id.* at 3.

9.  *Id.* at 3–4.

10.  *Id.* at 4.

11.  *Id.*

12.  *Id.*

13.  *Id.* at 5.

14.  *Id.* at 4.

15.  *Id.* at 6.

equinumerosity, compactness, and contiguity.[16]

With these as his guiding principles, the Special Master drafted Plan A, which not only effected a full § 2 remedy, but also protected communities of interest within acknowledged physical boundaries and conformed with the other traditional districting principles enumerated by the court. First, the equinumerosity principle was satisfied, since no district deviated, in total population, more than 5% from the ideal.[17] In addition, each of the districts was contiguous and relatively compact, and all district lines consistently followed center lines of streets or other well-defined boundaries.[18] The plan also allowed for three districts—districts 1, 2, and 5—with black voting age populations of 79.8%, 70.6%, and 74.6% respectively.[19]

## C.

As stated, the City of Greensboro objected to Plan A because it would require two pairs of incumbent councilpersons to run against each other. To protect the incumbents from such competition, the city suggested moving seven census tracts in Plan A. Because neither party had previously suggested that incumbency protection is a traditional districting factor that ought to be considered in the court's formulation of a redistricting plan, the court instructed the Special Master to direct the parties to file briefs with him on whether, and to what extent, incumbency should be considered. The Special Master was further instructed to file a supplemental report after considering their views. The Special Master retained complete discretion to recommend Plan A, to approve and recommend revisions to Plan A suggested by a party, or to recommend another plan entirely.

■ The Special Master found that incumbency protection is a legitimate districting factor, however one that is subordinate to the other traditional factors he was required to consider. The court concurs with the Special Master, and adopts the analysis of incumbency laid out in his supplemental report, as follows:

"Where consistent with federal constitutional and statutory requirements, it is axiomatic that when a district court fashions a redistricting plan, it 'should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature.' *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2355 [37 L.Ed.2d 335] (1973). Although protection of incumbents appears not to have been specifically raised by the City of Greensboro as a consideration prior to its recent objection, the defendant has now clearly requested that the court protect the incumbent council members where otherwise consistent with the special master's recommendation. Accordingly, it is appropriate to inquire whether incumbency protection is a permissible factor for the court to consider in drafting a redistricting plan."

"In the context of legislatively drawn plans, the Supreme Court has recently reaffirmed that 'incumbency protection, at least in the limited form of avoiding contests between incumbents, is a legitimate state goal.' *Bush v. Vera,* —— U.S. ——, [——,] 116 S.Ct. 1941, 1954 [135 L.Ed.2d 248] (1996) (plurality opinion) (internal citation omitted). In the context of court-drawn or fashioned redistricting plans, however, there is some disagreement. In *Wyche v. Madison Parish Police Jury,* 769 F.2d 265, 268 (5th Cir.1985) (per curiam), the Fifth Circuit explained that 'many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts.' By contrast, in *Buskey v. Oliver,* 574 F.Supp. 41 (M.D.Ala.1983), this court held that in fashioning a redistricting plan for the City of Montgomery, it must 'adhere to the City of Montgomery's legitimate policies and preferences,' and that,

---

**16.** *Id.* at 7.

**17.** *Id.* at 10–11. The ideal is not formed by the mean, but rather the average of total city population spread over five districts, or 609.

**18.** *Id.* at 11.

**19.** *Id.* at 10–11.

any plan fashioned by the court must therefore retain each incumbent council member's residence in his or her district,' among other factors." *Id.* at 43.

"The prevailing view, and the one the special master recommends that the court adopt, is that incumbency protection is a legitimate factor, but one that is subordinate to the traditional districting criteria described in the court's order of December 3, 1996. For example, in *Johnson v. Miller,* 922 F.Supp. 1556 (S.D.Ga.1995) (three-judge court), *prob. jurisdiction noted, Abrams v. Johnson,* — U.S. —, 116 S.Ct. 1823 [134 L.Ed.2d 928] (1996), the court, after finding that the State of Georgia had a historical preference for protecting incumbents, considered incumbency protection as a factor, but emphasized that 'since incumbency protection is inherently more political than factors such as communities of interest and compactness, the court subordinated it to the other considerations.' *Id.* at 1565. And in *LaComb v. Growe,* 541 F.Supp. 160 (D.Minn.1982) (three-judge court), the court credited the value of incumbency protection as 'an attempt to maintain existing relationships between incumbent legislators and their constituents.' *Id.* at 165 n. 13. The court found that protection of incumbents' relationships with their constituents 'may not be entitled to great weight in a reapportionment plan,' but that 'such relationships are sufficiently significant to justify minor adjustments in district lines to place incumbent legislators in districts consisting largely of their former districts, or to avoid contests between present incumbents.' *Id.* at 165. The special master, therefore, recommends to the court that incumbency protection be considered among the traditional districting factors set forth in its December 3, 1996 instructions, but only to the extent that it does not conflict with the other factors."

Special Master's supplemental report and recommendation filed on February 5, 1997, at 2–5 (footnotes and square brackets omitted).

The city's suggested changes to Plan A to protect incumbents, because they would require, to conserve equinumerosity among districts, that certain social and geographic boundaries be ignored, or communities separated into different districts, were found by the Special Master to be unacceptable.

Revisiting the various stage-one plans he drew up during his original visit to the reapportionment office, with an eye now turned towards inclusion of incumbency protection as a secondary factor, the Special Master recommended Plan B, which differs from Plan A by only three census tracts, but avoids a contest between one pair of incumbents. Being almost identical to Plan A, Plan B satisfies the traditional districting factors nearly as well as Plan A, fully remedies the § 2 violation, and yet, like Plan A, does not take race into account whatsoever. The main difference between the plans is that the maximum population deviation of the districts in Plan B, while well within the range required by the court's previous instructions, is slightly greater than in Plan A. Yet the change is so slight that avoidance of a contest between one pair of incumbents can be achieved without sacrifice. The plan allows for three districts—Districts 1, 2, and 5—with black voting age populations of 79.8%, 66.4%, and 76.4% respectively.

### D.

Because of the strong public nature of this case and because this is a class action in which the class representatives serve in a fiduciary capacity for the members of the class, the court has a special duty to review independently the Special Master's recommended Plan B to ensure that it adequately protects the interests of all class members and is otherwise in the public's interest. The court finds that Plan B meets these requirements.

The Special Master's recommended Plan B is exceptionally well crafted. As stated, it satisfies the "one-person, one-vote" principle of the equal protection clause of the fourteenth amendment to the Constitution. No district varies more than 5% from the ideal, a satisfactory limit. In addition, as did Plan A, Plan B effects a complete remedy for the city's acknowledged § 2 violation, creating from among five districts three in which

blacks constitute two-thirds or greater of the voting age population. Next, since the Special Master did not in any way consider race when applying traditional districting criteria towards the formulation of his Plan B, the court need not examine whether any of those factors were improperly subordinated. But finally, and perhaps most important in this longstanding litigation, the Special Master drafted a plan that not only satisfies all the extremely demanding requirements of § 2 and the equal protection clause, but one that also meets with the full approval of all parties, a composite feat that has eluded the parties and the court for a decade. This remarkable achievement is not a product of chance, however. The initial and supplemental reports submitted in support of Plan B reflect that the Special Master engaged a detailed and sensitive inquiry into, and determination of, the facts. The reports further reflect a thorough and well-reasoned application of guiding legal principles to the facts as found.[20]

For all of the above reasons, the court approves Plan B and adopts it as a redistricting plan for the City of Greensboro. A separate judgment and injunction will be entered accordingly.

---

**20.** As explained fully in the Special Master's supplemental report, because Plan B was drafted independently by the Special Master under directions received from the court, it is a court-drawn plan, and so does not require pre-clear-

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the recommendation contained in the initial report filed by Special Master Richard M. Gervase on January 3, 1997, and modified by him in his supplemental report filed on February 5, 1997, is adopted by the court;

(2) That defendant City of Greensboro, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are each RESTRAINED and ENJOINED from failing to implement and use Plan B (a copy of which is attached to this judgment and injunction) as the districting plan for the City of Greensboro in the forthcoming and any future city council elections.

It is further ORDERED that plaintiffs are allowed until March 31, 1997, to file their request for attorney's fees and expenses in this matter.

It is further ORDERED that costs are taxed against defendant City of Greensboro, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.

---

ance from the Justice Department in accordance with § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c. Special Master's supplemental report and recommendation filed on February 5, 1997, at 14.

## EXHIBIT 1

## PLAN B

## GREENSBORO REDISTRICTING

1584

DB: ALABAMA

District Statistics
Total Populations, All Ages
Plan: Greensboro Redistricting

Date: 12/13/96
Time: 9:04 am.
Page 1

Plan type: Greensboro City Council 5 Dist

| District Name | Number Members | Total Population | Ideal Population | District Variance | % District Variance |
|---|---|---|---|---|---|
| District 1 | 1 | 626 | 609 | 17 | 2.79% |
| District 2 | 1 | 639 | 609 | 30 | 4.93% |
| District 3 | 1 | 598 | 609 | -11 | -1.81% |
| District 4 | 1 | 587 | 609 | -22 | -3.61% |
| District 5 | 1 | 597 | 609 | -12 | -1.97% |
| Total | 5 | 3,047 | 3,045 | 2 | 0.07% |

PLANWIDE STATISTICS:

| | |
|---|---|
| Range of populations: | 587 to 639 |
| Ratio range: | 1.0886 |
| Absolute range: | -22 to 30 |
| Absolute overall range: | 52 |
| Relative range: | -3.61 to 4.93% |
| Relative overall range: | 8.54% |
| Absolute mean deviation: | 18.40 |
| Relative mean deviation: | 3.02% |
| Standard deviation: | 19.6876 |

DB: ALABAMA     District Summary     Date: 12/13/96
Total Populations, All Ages     Time: 8:57 a.m.
Plan: Greensboro Redistricting     Page: 1
Plan type: Greensboro City Council 5 Dist

| District Name | Total Pop. | Total White | Total Black | Total Am. Ind. | Total Asian/PI | Total Other |
|---|---|---|---|---|---|---|
| District 1 | 626 | 111 | 515 | 0 | 0 | 0 |
| | 100.00% | 17.73% | 82.27% | 0.00% | 0.00% | 0.00% |
| District 2 | 639 | 175 | 462 | 2 | 0 | 0 |
| | 100.00% | 27.39% | 72.30% | 0.31% | 0.00% | 0.00% |
| District 3 | 598 | 388 | 209 | 0 | 1 | 0 |
| | 100.00% | 64.88% | 34.95% | 0.00% | 0.17% | 0.00% |
| District 4 | 587 | 347 | 235 | 2 | 3 | 0 |
| | 100.00% | 59.11% | 40.03% | 0.34% | 0.51% | 0.00% |
| District 5 | 597 | 115 | 482 | 0 | 0 | 0 |
| | 100.00% | 19.26% | 80.74% | 0.00% | 0.00% | 0.00% |
| Total | 3,047 | 1,136 | 1,903 | 4 | 4 | 0 |
| | 100.00% | 37.28% | 62.45% | 0.13% | 0.13% | 0.00% |

DB: ALABAMA     District Summary     Date: 12/31/96
Ethnic Breakdown of Voting Age Populations     Time: 8:59 am.
Plan: Greensboro Redistricting     Page: 1
Plan type: Greensboro City Council 5 Dist

| District Name | Total Vot. Age | Vot. Age White | Vot. Age Black | Vot. Age Am. Ind. | Vot. Age Asian/PI | Vot. Age Other |
|---|---|---|---|---|---|---|
| District 1 | 395 | 80 | 315 | 0 | 0 | 0 |
| | 100.00% | 20.25% | 79.75% | 0.00% | 0.00% | 0.00% |
| District 2 | 431 | 145 | 286 | 0 | 0 | 0 |
| | 100.00% | 33.64% | 66.36% | 0.00% | 0.00% | 0.00% |
| District 3 | 476 | 302 | 173 | 0 | 1 | 0 |
| | 100.00% | 63.45% | 36.34% | 0.00% | 0.21% | 0.00% |
| District 4 | 407 | 294 | 109 | 2 | 2 | 0 |
| | 100.00% | 72.4% | 26.78% | 0.49% | 0.49% | 0.00% |
| District 5 | 403 | 95 | 308 | 0 | 0 | 0 |
| | 100.00% | 23.57% | 76.43% | 0.00% | 0.00% | 0.00% |
| Total | 2,112 | 916 | 1,191 | 2 | 3 | 0 |
| | 100.00% | 43.37% | 56.39% | 0.09% | 0.14% | 0.00% |