**John DILLARD, et al., Plaintiffs,**

v.

**CITY OF GREENSBORO, Defendant.**

No. CIV. A. 87–T–1223–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 14, 1999.

See also 956 F.Supp. 1576.

James U. Blacksher, Birmingham, AL, Pamela Karlan, University of Virginia School of Law, Charlottesville, VA, Elaine R. Jones, Norman J. Chachkin, Jacqueline A. Berrien, NAACP Legal Defense Fund, New York, NY, Edward Still, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for John Dillard, Damascus Crittenden, Jr., Earwen Ferrell, Clarence J. Jarrells, Ullysses McBride, Louis Hall, Jr., plaintiffs.

James U. Blacksher, Birmingham, AL, Elaine R. Jones, Norman J. Chachkin, Jacqueline A. Berrien, NAACP Legal Defense Fund, New York, NY, Edward Still, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Bobby Singleton, Teresa Buroughs, J.S. Thomas, Mamie Kennedy, intervenor–plaintiffs.

Richard H. Gill, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL, Nicholas H. Cobbs, Jr., Greensboro, AL, David R. Boyd, Balch & Bingham, Montgomery, AL, Mortimer Parker Ames, III, James H. Evans, Office of the Attorney General Alabama State House, Montgomery, AL, for City of Greensboro, defendant.

## ORDER

MYRON H. THOMPSON, District Judge.

The plaintiffs, African–American citizens of defendant City of Greensboro, Alabama, brought this lawsuit about twelve years ago, claiming that the at-large system used by the city to elect its city council violated § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973. This lawsuit is one of many § 2 voting-rights cases that have been before the court challenging at-large election systems across Alabama.[1] The cause is now before the court on the issue of attorneys' fees, costs, and expenses. The plaintiffs have filed motions seeking an award of $ 253,530.00 for attorneys' fees and $ 37,256.38 for expenses, for a total of $ 290,786.38, under the Voting Rights Act (42 U.S.C.A. § 1973l (e)), the Civil Rights Attorney's Fees Award Act of 1976 (42 U.S.C.A. § 1988), and a 1988 consent decree; and Greensboro has countered by filing its own motion for leave to file an application for fees in the amount of $ 28,296.00 and expenses in the amount of $ 6,229.30, for a total of $ 34,525.30, under § 1988. For the reasons that follow, the plaintiffs' motions will be granted to the extent that the court will award $ 139,310.20 for attorney's fees, and the court will require the parties to submit additional evidence on the extent to which the plaintiffs should recover expenses. Greensboro's motion will be denied in its entirety.

---

**1.** The court traced the evolution of these cases in some detail in *Dillard v. Baldwin County Bd. of Educ.,* 686 F.Supp. 1459, 1461 (M.D.Ala.1988).

## I. BACKGROUND

Although this twelve-year-old lawsuit does not want for historical documentation, a summary of its background is nevertheless in order because resolution of the attorneys' fees issue hinges on a careful examination of the history of this suit.[2]

### A. 1987 Consent Decree

In 1987, in response to the filing of this lawsuit and pursuant to a consent decree entered in this and numerous other *Dillard* lawsuits, Greensboro conceded that its at-large voting system violated § 2 of the Voting Rights Act and took part in a settlement that was to result in changing the jurisdiction from at-large to single-member district voting.[3] For the sake of simplicity, the court will throughout this order refer to the "post-consent-judgment" phase of the lawsuit to indicate the portion of the suit that post-dated the entry of the 1987 consent decree.

### B. 1992 Districting Plan

The court, through a magistrate judge serving as special master, accepted proposals from the parties for drawing the districts. All plans considered by the court contained five districts, and all assumed that two of the five districts would be white majority and two would be black majority. The controversy focused primarily on the fifth, or 'swing,' district. Eventually, in 1992, the magistrate judge recommended that a city plan, calling for the swing district (District 2) to be comprised of about 58% black voters, be adopted. That plan included, along with the swing district, two other black-majority districts, one having a black voting age population of 83% (District 1), and the other a black voting age population of 75% (District 3). Because the city's plan was legislative and thus required 'preclearance' pursuant to § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c, the court allowed the city to use the plan on an interim basis only.[4] In the 1992 municipal elections conducted pursuant to this plan, black council members were elected in Districts 1 and 3, but a white candidate was victorious in the swing district, District 2.

### C. 1994 Districting Plan

In December 1992, subsequent to the 1992 elections, the United States Attorney General refused. to preclear, and interposed an objection to, the 1992 city plan. The Attorney General concluded that the 1992 plan improperly "fragmented black population concentrations in order to *lower* the black percentage in District 2."[5] The Attorney General further noted that "a black-supported candidate in District 2 was defeated."[6]

In January 1993, in response to the Attorney General's decision, the plaintiffs filed a motion for further relief asking the magistrate judge to recommend approving a plan previously submitted by the plaintiffs on December 11, 1991.[7] The city responded by asking for additional time to fashion a new plan.[8] The magistrate judge agreed, and the city adopted a new plan in August 1993.[9] The 1993 plan created three majority-black districts. District 1 contained a black voting-age population of 83%; District 2, the swing district, contained a black voting-age population of 63%; and District 3 contained a black

---

**2.** The following published opinions provide a detailed history of this case: *Dillard v. City of Greensboro*, 956 F.Supp. 1576 (M.D.Ala.1997); *Dillard v. City of Greensboro*, 74 F.3d 230 (11th Cir.1996); *Dillard v. City of Greensboro*, 946 F.Supp. 946 (M.D.Ala.1996); and *Dillard v. City of Greensboro*, 865 F.Supp. 773 (M.D.Ala.1994).

**3.** *See* Selection of defendant subclass option, filed on August 12, 1987.

**4.** Section 5 of the Voting Rights Act requires that the United States Attorney General preclear any plan proposed by a State or political subdivision that is subject to 42 U.S.C.A. § 1973b. 42 U.S.C.A. § 1973c. The Code of Federal Regulations, however, provides that a federal court may authorize the emergency interim use of a redis-

tricting plan without first securing the approval of the Attorney General. 28 C.F.R. § 51.18(c).

**5.** Letter from the United States Attorney General, dated December 4, 1992, and filed with the court on January 4, 1993, at 2 (emphasis added).

**6.** *Id.*

**7.** Plaintiffs' motion for further relief, filed on January 14, 1993.

**8.** Defendant's motion for continuance, filed on July 7, 1993.

**9.** United States Magistrate Judge's Order of July 9, 1993.

voting-age population of 73%. The city submitted the 1993 plan to the Attorney General for pre-clearance. Once again, the Attorney General interposed an objection under § 5. Although District 2's black voting age population had been increased from 58% to 63%, the Attorney General found that the 1993 plan still improperly hindered African–Americans from electing candidates of their choice.[10] First, she observed that the black voting-age majority in District 2 was still insufficient in light of, among other factors, "the reduced electoral participation of black persons, which is traceable to a history of discrimination."[11] Second, she concluded that the city's actions appeared to have been "calculated to limit black voting strength."[12] She explained that the city "has provided no satisfactory explanation for limiting black electoral opportunities in this manner," in view of the fact that "the city was aware of several alternative plans ... in which black voters constituted a greater majority of the voting age population" in District 2.[13]

Subsequently, in January 1994, the plaintiffs filed a renewed motion for further relief, once again asking the magistrate judge to recommend adopting their December 11, 1991, plan.[14] The city countered by requesting that the magistrate judge himself draw a new plan. In May 1994, the magistrate judge issued a recommendation that the court adopt the plaintiffs' plan and order immediate elections.[15] The city objected to the magistrate judge's recommendation and requested that the court itself draft a plan, noting that a court-ordered plan would not be subject to § 5 preclearance. In June 1994, the city attorney submitted to the court a plan that slightly modified the city's 1993 plan as an example of how the court could

design its own plan in a way that would better comply with the city's districting preferences than did the plaintiffs' plan, but still provide a reasonable opportunity to elect a minority-preferred candidate.[16] This 1994 proposed plan was never adopted by the city.

On October 11, 1994, in view of the Attorney General's objection to the city's 1992 and 1993 plans, the court adopted the plaintiffs' originally-proposed plan, concluding that "any plan adopted must specifically remedy the objections of the Attorney General." *Dillard v. City of Greensboro*, 865 F.Supp. 773, 776 (M.D.Ala.1994). The plaintiffs' plan contained three majority-black districts with black voting-age populations of 85%, 80%, and 76%. The court declined the city's request that it, perhaps with the aid of a special master, draw up its own plan based upon the city's plan, which included a 66% black majority in the swing district, citing the lack of necessary evidence regarding the traditional districting factors applicable to Greensboro, as well as the possibility that the increase in size of the black majority in the swing district from 63% to 66% would be insufficient to assuage the Attorney General's concerns. Additionally, the court noted that aside from the fact that it plainly would satisfy the Attorney General, the plaintiffs' plan was preferable because more than a simple majority-black district would be needed to bring blacks back into the electoral process as equals, given that the history of discrimination in Greensboro had produced markedly reduced electoral participation by blacks. *Id.* at 778.

### D. 1997 Districting Plan

On January 3, 1996, the Eleventh Circuit Court of Appeals vacated this court's October

---

10. Letter from the United States Attorney General, dated January 3, 1994, and filed with the court on January 6, 1994, at 2.

11. *Id.* More specifically, she explained that, "While the plan provides for slight increases in the black population percentages in District 2, the opportunity for black voters to elect a representative of their choice in that district appears to have been constrained deliberately, taking into account the continued fragmentation of black population concentrations, the pattern of racially polarized voting and the reduced electoral partic-

ipation by black persons, which is traceable to a history of discrimination." *Id.*

12. *Id.*

13. *Id.*

14. Plaintiffs' renewed motion for further relief, filed on January 6, 1994.

15. Recommendation of the magistrate judge entered on May 16, 1994.

16. Defendant's letter, filed on June 14, 1994.

1994 injunction and remanded this case "for a reevaluation of the proposed redistricting plan in light of *Miller[ v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ]." *Dillard v. City of Greensboro,* 74 F.3d 230, 236 (11th Cir.1996). *Miller,* which had been issued by the Supreme Court after this court's approval of the plaintiffs' districting plan, established that districting plans must satisfy strict scrutiny when they are found to have been drawn predominantly based on race. Because this court did not have the benefit of *Miller* when it adopted the plaintiffs' plan, the Eleventh Circuit remanded the case with the following instructions:

"If the district court determines on remand that racial gerrymandering exists, then a redistricting plan submitted by either party will be the subject of strict scrutiny. Under the strict scrutiny test, a plan must be shown to be narrowly tailored to achieve a compelling state interest. This test will be satisfied if evidence of past discrimination is shown and there is a sufficient evidentiary basis to establish that the plan is narrowly tailored to remedy that discrimination."

74 F.3d at 234.

After remand, the court held a hearing to determine how to proceed with the litigation. At the hearing, the plaintiffs continued to urge endorsement of their plan, insisting that it satisfied strict scrutiny and, unlike any plan championed by the city, fully remedied the original § 2 violation. The city countered by submitting its own districting plans for consideration. However, rather than evaluating the city's plans or conducting an examination of the plaintiffs' plan to ascertain whether it was indeed race-based and, if so, satisfied strict scrutiny, the court, by agreement of the parties, appointed Special Master Richard M. Gervase to recommend to the court a redistricting plan for Greensboro.

By order entered on December 3, 1996, the court specified the legal standards and criteria to be used by Special Master Gervase in formulating his plan. *See Dillard v. City of Greensboro,* 946 F.Supp. 946 (M.D.Ala.1996). The court fashioned a three-stage procedure for the Special Master to follow, under which he was first to "endeavor to fashion a plan that cures the § 2 violation solely through the application of race-neutral traditional drafting principles." *Id.* at 953–955. The court instructed the Special Master to go no further than stage one if, at that stage, he could serendipitously, yet fully, address the § 2 violation, solely through application of " 'traditional, race-neutral districting principles, including but not limited to compactness, contiguity, [and] respect for political subdivisions or communities defined by actual shared interests.' " *Id.* (quoting *Miller,* 515 U.S. at 916, 115 S.Ct. at 2488). The Special Master was to proceed to stage two, however, "if he found that the employment of race as a factor was necessary to cure the § 2 violation." *Id.* at 955. At this stage, he was permitted to employ race as a factor, "but he should first attempt to see if a plan can be drawn in which race is not the dominant factor." *Id.* Finally, the court instructed that "if in order to cure the § 2 violation the Special Master must not only consider race but must give it dominant consideration," he was to go to stage three. *Id.* At this stage, the Special Master could employ race as a dominant factor in fashioning a plan, but was told that the "plan must be narrowly tailored to cure the § 2 violation." *Id.*

Bearing these instructions in mind, Special Master Gervase first reviewed the entire record in this litigation, including all previous reapportionment plans that the parties had submitted to the court. The Special Master concluded that none of the previously-submitted plans could be endorsed at stage one, because none sufficiently eschewed racial considerations in favor of traditional districting principles. Thus, the Special Master abandoned the various plans submitted by the parties, and instead applied traditional districting principles, to the exclusion of racial considerations, to devise a new plan (Plan A) that cured the § 2 violation "completely and with certitude." *Dillard v. City of Greensboro,* 956 F.Supp. 1576, 1579 (M.D.Ala.1997). Because he had succeeded in formulating an appropriate plan at stage one, the Special Master heeded the court's instructions and went no further. *Id.*

The City of Greensboro objected to Plan A, however, because it would have required

two pairs of incumbent council members to run against each other. *Id.* at 1580. After concluding that incumbency protection is a legitimate districting factor, albeit a secondary one subordinate to the other traditional factors, *id.* at 1580–81, Special Master Gervase devised, and this court approved, a new plan (Plan B), which avoided a contest between one pair of incumbents. *Id.* at 1581. Plan B, like its predecessor Plan A, did not take race into account in any way whatsoever. The plan allowed for three districts with black voting-age populations of 79.8% (District 1), 66.4% (District 2), and 76.4% (District 5). *Id.* Thus, the swing district in the plan ultimately approved by the court contained a black voting-age population of 66.4%.

Neither party objected to Plan B, and the court approved the plan by memorandum opinion entered on February 26, 1997. *Id.* at 1582. In endorsing Plan B, the court noted that because the plan was independently drafted by the Special Master pursuant to the court's specific directions, it constitutes a court-drawn plan that need not be precleared by the Justice Department in accordance with § 5 of the Voting Rights Act. *Id.* at 1582 n. 20.

### E. 1988 Consent Decree

In addition to the foregoing background information, also pertinent to the plaintiffs' pending motions for a fee award is a second consent decree, which specified the amount of fees, expenses, and costs to which the plaintiffs were entitled for the early, § 2–liability–related stages of this litigation. This 1988 consent decree was an omnibus order, entered on August 26, 1988, in all the *Dillard* voting rights cases then before the

court. The decree further ordered that the plaintiffs were entitled to recover for "time and expenses incurred in connection with any second or subsequent hearing relating to the jurisdiction." The decree provided in part as follows:

"[E]ach jurisdiction shall be individually responsible for any attorney's fees and expenses to which the plaintiffs may be entitled for 'extraordinary work' done by plaintiffs' attorneys relating to the jurisdiction subsequent to the fees and expenses included in the settlement proposal dated May 26, 1988 upon which the parties' agreement is based. 'Extraordinary work' shall be defined as time and expenses incurred in connection with any second or subsequent hearing relating to the jurisdiction, any work in excess of one hour per jurisdiction related to preclearance proceedings, and any enforcement proceedings. The plaintiffs' attorneys shall be able to assert whatever claim for fees and expenses for such 'extraordinary work' that they contend is allowed by law."

Revised consent order and judgment, entered on August 26, 1988.[17]

On March 28, 1997, the plaintiffs submitted their motion seeking an award of fees, costs, and expenses for the post-consent-judgment phase of this litigation. This motion was amended on May 13, 1997, to include a request for compensation of time expended on the fee-award dispute. On April 30, 1997, Greensboro countered by seeking leave to file its own motion for a fee award. Greensboro sought special "leave" because it had missed both the March 31, 1997, fee-petition deadline set by the court in its final judg-

---

**17.** There was initially some confusion for the court regarding the 1988 consent decree. In a pleading filed on March 6, 1997, the plaintiffs filed what they said was a copy of the 1988 consent decree, dated August 2 (rather than August 26), 1988, which limited the recovery rate for the plaintiffs' counsel to $ 150 an hour for post-consent-judgment work, and the court initially was going to so limit their rate. The August 2, 1988, omnibus order provided in part as follows:

"[A]ny jurisdiction shall be responsible for 'extraordinary work' done by plaintiffs' attorneys relating to the jurisdiction after July 1, 1988. 'Extraordinary work' shall be defined as time and expenses incurred in connection with any

second or subsequent hearing relating to the jurisdiction, any work in excess of one hour per jurisdiction related to the preclearance proceedings, and any enforcement proceedings. The plaintiffs' attorneys shall bill such work at the rate of one hundred fifty dollars ($150.00) per hour; the jurisdiction shall pay the time charges and expenses promptly after billing."

However, in their brief filed on March 28, 1997, the plaintiffs referred to an August 26, 1988, consent decree, the one given in part in the above text, which, as the court learned through its own review of the record, replaced the August 2, 1988, consent decree and which omitted any reference to the $ 150 rate.

ment of February 26, 1997, and the 14-day fee-petition deadline set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure.

## II. PLAINTIFFS' MOTIONS FOR ATTORNEYS' FEES AND EXPENSES

### A. Preliminary Matters

Courts are authorized under 42 U.S.C.A. § 1973*l* (e) to award reasonable attorneys' fees to prevailing litigants under the Voting Rights Act.[18] Courts are also authorized under the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C.A. § 1988, to award a reasonable attorneys' fee to prevailing parties in lawsuits brought under certain civil rights statutes.[19] In addition, as noted, the 1988 consent decree in this litigation authorizes the plaintiffs to recover fees and expenses for post-liability work.

Here, the plaintiffs' fee request may be broken down as follows:

| Attorneys | Hours | Rates | Individual Fee |
|---|---|---|---|
| Edward Still | 481.20 × | $300 | 109,170.00 |
| James U. Blacksher | 363.90 × | $300 | 144,360.00 |
| Subtotal | | | $253,530.00 |
| Expenses | | | $ 37,256.38 |
| Total | | | $290,786.38 [20] |

▪ In assessing the plaintiffs' fee-and-expense request, the court makes two initial points. First, the court notes that the civil rights statutes for which § 1988 authorizes attorneys' fees and expenses—for example, 42 U.S.C.A. §§ 1981, 1981a, 1982, 1983, 1985, and 1986—do not include the Voting Rights Act.[21] Therefore, the court will consider the plaintiffs' fee-and-expense request under only § 1973*l* (e) and the 1988 consent decree.

Second, the court notes that some of the fees and expenses sought by the plaintiffs can be awarded, if at all, only by the Eleventh Circuit Court of Appeals. The following hours sought by Still and Blacksher are for work done in the appeal of this case:

| Attorneys | Hours | Time Period |
|---|---|---|
| Still | 78.15 | Nov. 29, 1994, to Jan. 5, 1996 |
| Blacksher | 80.70 | Jan. 18, 1995, to Jan. 8, 1996 [22] |

Still and Blacksher did not breakout the expenses they incurred for their appellate work, and thus the court cannot do so either.

▪ The Eleventh Circuit has made clear that a district court is not authorized to award fees and expenses for appellate work; instead, "If a party wishes to obtain fees on appeal, he or she must file a petition with the clerk of the clerk of [the Eleventh Circuit] within fourteen days of the issuance of the opinion of [that] court." *Mills v. Freeman*, 118 F.3d 727, 734 (11th Cir.1997); *see also Davidson v. City of Avon Park*, 848 F.2d 172, 173 (11th Cir.1988) ("As to fees for services on appeal, we hold that the district court is not authorized … to control the filing time or assessment of attorney's fees for services ·

---

**18.** Section 1973*l* (e) provides as follows:

"In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

**19.** Section 1988 provides in part as follows:

"(b) Attorney's fees
In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless

such action was clearly in excess of such officer's jurisdiction."
"(c) Expert fees
In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee."

**20.** *See* Plaintiffs' supplemental motion for award of fees, costs, and expenses, filed on May 13, 1997. In their supplemental motion, plaintiffs incorrectly total their expenses to be $ 37,120.11 rather than $ 37,256.38. Greensboro has not challenged the plaintiffs' calculations, and thus, with this exception regarding the totaling of expenses, the court has taken the calculations as accurate.

**21.** *See supra* note 19.

**22.** As is obvious, the court has relied on the time the hours were expended in deciding that they were for appellate work.

rendered on appeal.").[23] Still's and Blacksher's fees will therefore be reduced, with the result that only the following hours are appropriate for consideration by this trial court:

| Attorneys | Hours | Less | Remaining |
|---|---|---|---|
| Still | 481.20 | 78.15 | 403.05 |
| Blacksher | 363.90 | 80.70 | 283.20 |

## B. Prevailing Party

As stated, § 1973*l* (e) provides for an award of reasonable attorneys' fees to prevailing litigants under the Voting Rights Act. Greensboro contends that the plaintiffs cannot recover under either § 1973*l* (e) or the 1988 consent decree because they are not prevailing parties, in that they ultimately failed to gain approval of their preferred, race-based districting plan, and the court instead adopted a plan based on traditional, race-neutral principles. Greensboro further asserts that, if any party may be said to have prevailed in the post-consent-judgment portion of this litigation, it is the city and not the plaintiffs, because the city successfully challenged on appeal the court's approval of the plaintiffs' 1991 voting scheme. As will be seen, the court concludes that the plaintiffs should be awarded attorneys' fees pursuant to § 1973*l* (e) and the 1988 consent decree, but only for a portion of their litigation efforts, because they have, at best, only partially prevailed during the course of this lawsuit.

■ In *Hensley v. Eckerhart*, the Supreme Court held that, under § 1988, a plaintiff may be considered a prevailing party if the plaintiff succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). As the Supreme Court explained in *Texas State Teachers Ass'n v. Garland Indep. School Dist.*, awards of attorney's fees are not dependent upon the plaintiff succeeding on 'all' of his or her claims or even on achieving success on the 'central' issue in the litigation. 489 U.S. 782, 790–91, 109 S.Ct. 1486, 1492–93, 103 L.Ed.2d 866 (1989). All the significant-relief standard requires is that

the plaintiff receive at least some relief on the merits of his or her claim. Once this requirement is met, the plaintiff has crossed the threshold to a fee award of some kind. *Id.* at 792, 109 S.Ct. at 1493. Because § 1988 and § 1973*l* (e) contain similar prevailing-party language, these principles apply to § 1973*l* (e) as well.[24] *See Brooks v. Georgia State Board of Elections*, 997 F.2d 857, 861 (11th Cir.1993); *Maloney v. City of Marietta*, 822 F.2d 1023, 1025 n. 2 (11th Cir.1987) (per curiam).

There is no question that the plaintiffs were prevailing parties in the initial stages of this lawsuit, when Greensboro conceded that its at-large election system was in violation of § 2 of the Voting Rights Act, and participated in settlement negotiations culminating in the 1987 consent decree. In fact, under the terms of the subsequent 1988 consent decree, pertaining to fees, expenses and costs, the plaintiffs were awarded, and Greensboro paid, attorneys' fees. The principal issue raised by the plaintiffs' most recent fee request, however, is whether they are prevailing parties as to the post-consent-judgment phase of this lawsuit. Absent such a showing, according to Greensboro, the plaintiffs are not entitled to recover what they seek by their current motions, namely their attorneys' fees and expenses for the time expended after the 1987 consent decree was entered. Unfortunately, aside from an assertion that they are eligible for attorneys' fees and expenses because the city conceded its liability under § 2 in 1987, the plaintiffs offer no argument as to why they are prevailing parties with respect to the post-consent-judgment stages of this litigation.

■ In complex litigation that often entails extensive remedial efforts, it is generally accepted that prevailing plaintiffs are entitled to post-judgment fee awards for legal services necessary for securing compliance with, and reasonable monitoring of, the decree. *Association for Retarded Citizens of North Dakota v. Schafer*, 83 F.3d 1008, 1010 (8th Cir.1996). The reasoning underlying

---

**23.** Of course, on occasion, the Eleventh Circuit has, after holding that a party is entitled to fees and expenses for appellate work, remanded to a trial court the matter of determining how much

the party should receive in fees and expenses. This did not happen here, however.

**24.** *See supra* notes 18 and 19.

this general notion can be viewed as two-fold. First, "[c]omplex civil rights cases seldom end with the grant of a permanent injunction." *Id.* "The injunction must be implemented, that process must be monitored, and lingering or new disputes over interpretation of the decree must often be presented to the court for resolution. These functions take time and effort by the prevailing party's attorney." *Id.* Second, the nature of the relationship between the plaintiff and the defendant, after a judgment in plaintiff's favor, changes, or should change, dramatically. For pre-judgment fees and expenses, the plaintiff and the defendant have divergent goals, and each is viewed as having lost or won depending upon in whose favor the court has found. By contrast, after a judgment in the plaintiff's favor, the plaintiff and the defendant have essentially a common goal: compliance with the judgment. Thus, in the post-judgment years, *both* the plaintiff and the defendant prevail when the defendant reaches full compliance—the plaintiff having prevailed because he has obtained the relief he sought, and the defendant having prevailed because it can now be released from the judgment; that is, the case is over.

However, the mere fact that efforts are post judgment does not mean that they are compensable. First, "when 'claims distinctly different from the underlying lawsuit' arise after resolution of the main civil rights issues, plaintiffs must prevail on these unrelated claims to be entitled to a fee award of the post-judgment work." *Schafer,* 83 F.3d at 1011 (quoting *Willie M. v. Hunt,* 732 F.2d 383, 386 (4th Cir.1984)). Second, even if the post-judgment work is solely in pursuit of compliance with the judgment, the work must still "be reasonable and necessary," *Schafer,* 83 F.3d at 1011, as measured by the standard articulated in *Hensley v. Eckerhart* "that requires balancing the amount of effort against plaintiffs' overall success." *Schafer,* 83 F.3d at 1011.

It would appear that, because, as stated, the plaintiff and the defendant have a common goal in their post-judgment work (compliance with the judgment), application of the above *Hensley v. Eckerhart* standard—balancing the amount of effort against plaintiffs' overall success—would be direct and easy. However, and regrettably, it is all too often true—indeed, it seems to be more the rule than the exception—that the plaintiff and the defendant lose sight of, or never realize, the common goal they share in post-judgment proceedings, and, instead, they tend to revert back to their pre-judgment posture, with *both* the plaintiff and defendant posturing themselves as if the plaintiff can prevail only if the defendant loses, and as if the defendant can prevail only if the plaintiff loses. Having reverted back, the defendant tends to view the plaintiff's efforts as necessarily inconsistent with the defendant's interest, and the plaintiff tends to view the defendant's efforts as necessarily inconsistent with the plaintiff's interest. When the parties revert back to their pre-judgment posture, they see the litigation as nothing more than a new chapter in their ongoing battle, and winning the battle, rather than obtaining compliance, becomes the goal, with the result that the litigation becomes an abstract test of each other's wills rather than a beneficial vindication and realization of real rights, and, with the result, unwitting or not, that the litigation is unnecessarily and greatly prolonged.

Admittedly, the 1988 consent decree, unlike § 1973*l* (e) and § 1988, does not contain any prevailing-party language. The decree simply says that the plaintiffs shall recover for "time and expenses incurred in connection with any second or subsequent hearing relating to the jurisdiction." However, the post-decree fee principles described above still apply to the 1988 consent decree. Surely, the parties could not, and did not, contemplate that the plaintiffs could recover for all fees and expenses incurred by the plaintiffs no matter how unreasonable.

Here, the post-consent-judgment work of the plaintiffs did not entail " 'claims distinctly different from the underlying lawsuit,' " *Schafer,* 83 F.3d at 1011 (quoting *Willie M.,* 732 F.2d at 386), but rather was solely in pursuit of a remedy for the original § 2 claim. Without question, therefore, because the plaintiffs here successfully obtained the 1987 consent decree, they are prevailing parties under § 1973*l* (e) and the 1988 consent decree, and, as prevailing parties, they are entitled to be reimbursed for reasonable fees and expenses incurred in implementing the

1987 consent decree. The critical question, however, is whether they are entitled to all of the fees and expenses they seek.

### C. Appropriate Fees

 Having found that the plaintiffs are prevailing parties, the court must next determine the appropriate amount of fees to be awarded. As this court has repeatedly stated, the starting point in setting any attorney's fee is determining the "lodestar" figure—that is, the product of the number of hours reasonably expended to prosecute the lawsuit and the reasonable hourly rate for work performed by similarly situated attorneys in the community. *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988); *accord Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The fee applicant bears the burden of "establishing entitlement and documenting the appropriate hours and hourly rates." *Norman*, 836 F.2d at 1303. After calculating the lodestar fee, the court should then proceed with an analysis of whether any portion of this fee should be adjusted upwards or downwards. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565–66, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *Hensley*, 461 U.S. at 433–34, 103 S.Ct. at 1939–40.

In making the above determinations, the court is guided by the 12 factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).[25] *See Blanchard v. Bergeron*, 489 U.S. 87, 91–92, 109 S.Ct. 939, 943–44, 103 L.Ed.2d 67 (1989); *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of professional relationship with the client; and (12) awards in similar cases.

### 1. *Reasonable Hours*

 Two attorneys, Edward Still and James U. Blacksher, represented the plaintiffs in this matter. Excluding the time for appellate work, Still seeks compensation for 403.05 hours and Blacksher seeks compensation for 283.20 hours.

The court considers three *Johnson* factors—the time and labor required, the novelty and difficulty of the case, and the amount involved and the result obtained—in assessing the reasonableness of the hours claimed by the plaintiffs' counsel. Or, to put it more succinctly, as stated above, the court must balance the amount of effort against the plaintiffs' overall success. Here, the plaintiffs' overall success was the development of a single-member-district plan that remedied the § 2 violation. The critical question for the court is whether the hours expended by the plaintiffs' counsel were reasonable in light of this success.

In resolving this question, the court will conduct a two-step inquiry. First, it will examine the record to ascertain with as much precision as possible the plaintiffs' objectives in the post-consent-judgment phase of this litigation. Second, the court will assess whether the plaintiffs have achieved any of those objectives.

As stated, the first step is to glean the precise nature of the plaintiffs' post-consent-judgment litigation objectives, so that they may be compared to the relief that the plaintiffs ultimately obtained. Based upon the record before it, the court concludes that the plaintiffs' original objectives in this lawsuit, to have the then-extant Greensboro at-large election system declared invalid and dismantled in favor of one that comported with § 2 of the Voting Rights Act, changed in a significant fashion once the city conceded that the election system ran afoul of § 2 and the 1987

---

**25.** In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

consent judgment was entered in this case. Specifically, at that stage of the litigation the plaintiffs' focus shifted from the establishment of the city's liability to the development and implementation of a new, single-member-district plan that would begin to reverse the longstanding disenfranchisement of blacks in Greensboro and bring them back into the electoral process in a meaningful way, thereby wrenching the city's election system into compliance with the strictures of § 2. The precise means by which the plaintiffs sought to accomplish this objective was through the formulation of a districting plan, unabashedly grounded on racial considerations, that created three super-majority black districts.

Here, the proper 'benchmark' against which to measure these objectives is the 1997 districting plan adopted by the court because, to the extent that the plaintiffs obtained any relief, it came in the form of the final districting plan adopted by the court in 1997. Before specifically examining the details of this plan, the court first emphasizes that, ultimately, it did not endorse any plan submitted by either party in this case, nor did it model the eventual plan on any of these schemes, or use them in any way in crafting the final plan. Instead, as stated, the court enlisted the aid of Special Master Gervase who, upon evaluation of the previously-submitted schemes, opted to abandon them in favor of a *sui generis* plan premised exclusively on traditional, race-neutral districting considerations.

Turning to the specifics of the Special Master's plan, the court notes that it, like all of the plans that the parties submitted to the court for consideration, establishes three majority-black districts in Greensboro. Of particular relevance to the attorneys' fees dispute is the fact that the crucial swing district created by the Special Master's plan has a black voting-age population of 66%. This may be compared to the city's 1992 plan, with its 58% black majority in the swing district, and the plaintiffs' preferred plan, which called for the creation of a 76% black super-majority in that district. In light of these comparisons, the plaintiffs appear to have accomplished at least one of their principal post-consent-judgment litigation objectives. Specifically, the plan ultimately approved by the court is more favorable to the plaintiffs

than that proposed by the city in 1992 because it creates a swing district having a greater black majority than the city's original plan (66% versus 58%). Thus, the plaintiffs obtained some of their desired relief to the extent they sought the adoption of a voting scheme in which black voters in the swing district would enjoy a greater opportunity to elect the candidate of their choice than they would under the city's 1992 plan, in which the swing district was formulated simply to more or less reflect the city's overall racial composition. It is therefore evident that the plaintiffs did indeed succeed in a significant way.

However, at the same time, it is clear that the plaintiffs' success is limited, at best, and that therefore they may be said to have only partially prevailed. As explained above, throughout the post-consent-judgment portion of this lawsuit the plaintiffs consistently argued that their original, 1991 districting scheme, with its 76% black super-majority district, should be adopted by the court as the sole remedy of the conceded § 2 violation. This plan was unabashedly grounded on racial considerations, and was recognized as such by all concerned. Only after the United States Attorney General refused to preclear the 1992 and 1993 plans developed by Greensboro did the plaintiffs finally succeed in convincing the court that their 1991 plan should be adopted. However, this victory was short-lived, because on appeal the Eleventh Circuit vacated the order adopting the scheme, and remanded the case for consideration of the plaintiffs' plan in view of *Miller*. Had the Eleventh Circuit affirmed this court's order and thus approved the plaintiffs' plan, or had this court, on remand, concluded that the plan passed constitutional muster even in the face of *Miller*'s stringent standard, the plaintiffs indisputably would have succeeded fully. However, the Eleventh Circuit refused to uphold the plaintiffs' plan, and on remand this court never addressed the constitutionality of the plan in light of *Miller*, opting, instead, to charge the Special Master with fashioning a new plan based upon the application of traditional districting criteria in the absence of racial considerations.

Thus, while the ultimate plan developed by Special Master Gervase and approved by the court did indeed create a third majority-black district having a greater percentage of black voting age residents than that proposed by the city in 1992, this plan failed to vindicate fully what was clearly the plaintiffs' principal objective in the post-consent-judgment litigation: the creation of a voting scheme for Greensboro that included a *super*-majority black swing district (the plaintiffs urged a black majority of 76%), based upon the explicit consideration of voters' race, in order to fully remedy past discrimination against, and disenfranchisement of, black voters. Consequently, this court concludes that the plan ultimately adopted by the court affords the plaintiffs only a portion of the relief they sought in the post-consent-judgment stages of this litigation.

The limited extent to which the plaintiffs have prevailed in the post-consent-judgment litigation is further illustrated by an examination of the success that Greensboro has achieved in this phase of the lawsuit. Greensboro's efforts in opposing the 1994 adoption of the plaintiffs' districting plan, including the appeal taken to the Eleventh Circuit, unquestionably played an important role in shaping the ultimate outcome of this lawsuit. *Cf. Fain v. Caddo Parish Police Jury*, 564 F.2d 707, 709 n. 3 (5th Cir.1977) ("in preventing the implementation of the objectionable plan the appellant 'prevailed on an important matter in the course of litigation ... .'"). While it is an overstatement to suggest, as Greensboro does, that its efforts resulted in the invalidation of the plaintiffs' 1991 plan as unconstitutional, because the Eleventh Circuit reached no such conclusion and this court never specifically addressed whether the plan was constitutionally infirm under *Miller*, it nonetheless is accurate to conclude that the city, by persuading the Eleventh Circuit to vacate the order adopting the plaintiffs' plan, helped convince this court to fashion a new plan that was grounded on neither considerations of race, nor an attempt to satisfy the United States Attorney General, who had rejected the previous city-drafted, court-approved voting schemes. By accomplishing these objectives, and succeeding in frustrating the plaintiffs' efforts to gain adoption of their preferred voting scheme, Greensboro did much to thwart the plaintiffs' litigation objectives.

Greensboro points out that it was Greensboro, and not the plaintiffs, which first, in 1994, urged the court to draft its own districting plan, and suggested that a Special Master may be employed for this purpose. To be sure, at that time, the plaintiffs were still pressing for adoption of their original 1991 plan, and until the court indicated that it planned to enlist the aid of a Special Master, after the case was remanded by the Eleventh Circuit, the plaintiffs never suggested on their own or agreed with the city that such a procedure should be employed. However, more than likely the plan the court would have adopted back then would not have been similar to the one the court adopted in 1997. Most importantly, the court would probably have unabashedly relied upon racial considerations, as did both the plaintiffs and Greensboro in fashioning their plans. Back then, the court would not have had the benefit of *Miller* and, more importantly, the Eleventh Circuit's interpretation of *Miller*, two directives which directly shaped the three-step procedure fashioned by the court for the Special Master to follow and which led to adoption of a plan that relied on traditional districting principles, to the exclusion of racial considerations, and, at the same time, "completely and with certitude," *Greensboro*, 956 F.Supp. at 1579, cured the § 2 violation. Thus, the court is firmly convinced that the fact that Greensboro suggested in 1994 that the court fashion its own plan, while an appropriate consideration, does not preclude recovery of fees by the plaintiffs completely.

Thus, the court concludes that only part of the plaintiffs' efforts were reasonable and necessary. However, because the court is further convinced that the major part of their efforts were reasonable and necessary, the court will reduce the hours claimed by the plaintiffs by only 30%, with the result that the plaintiffs may recover for 70% of their claimed hours as follows:

| Attorneys | Hours | | Remaining |
|-----------|-------|------|-----------|
| Still | 403.05 | 70% | 282.14 |
| Blacksher | 283.20 | 70% | 198.24 |

To be sure, the 403.05 hours claimed by Still include time he expended in litigating the fee award, specifically 53.30 hours. It is well-settled that compensation for time expended in pursuit of attorneys' fees is proper, *Johnson v. Mississippi*, 606 F.2d 635, 638 (5th Cir.1979), and the court finds that the hours expended by Still in pursuit of fees were reasonable and necessary.

The court has also conducted an independent review of all of the hours for which compensation is sought to determine if there is any time that should be excluded because it is "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40. The court is satisfied that, with the adjustments described above, these hours appear to have been necessary to secure relief in this case. The court further finds that the issues in this lawsuit were somewhat difficult, and that the adjusted hours expended were reasonable in relation to the difficulty of the issues.

### 2. *Prevailing Market Rate*

Next, the court must determine the proper hourly rate at which the plaintiffs' counsel should be compensated for the time they expended in this litigation. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299. Both Still and Blacksher contend that they should be compensated at $300 an hour. To determine the prevailing market rate, the court will consider the following *Johnson* factors: customary fee; whether the fee is fixed or contingent; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the experience, reputation, and ability of the attorneys; time limitations; preclusion of other employment; undesirability of the case; nature and length of professional relationship with the client; and awards in similar cases.

*Customary Fee:* "The customary fee for similar work in the community should be considered." *Johnson*, 488 F.2d at 718. The plaintiffs have submitted affidavits making the general contention that the fee in complex voting rights cases of $300 an hour for attorneys of Still's and Blacksher's experi-

ence is reasonable. They also cite a number of decisions from civil rights cases in Alabama to establish that federal courts have awarded fees at rates ranging from $225 to $350 per hour. Still states that his usual hourly fee in non-contingent cases is $200 per hour, but that he has been awarded fees of $290 and $350 per hour by courts.

Greensboro counters that the billing rate sought by Still and Blacksher greatly exceeds the prevailing rates charged by attorneys in Montgomery having similar skills and experience, and proffers affidavits to support this assertion.

The court concludes on the basis of the evidence submitted by the parties that the customary or usual billing rate for civil rights cases, and voting rights cases in particular, ranges from approximately $125 to approximately $350 per hour in certain cases.

*Fixed or Contingent Fee:* "This factor focuses judicial scrutiny solely on the existence of any contract for fees that may have been executed between the party and his attorney." *Medders v. Autauga County Bd. of Educ.*, 858 F.Supp. 1118, 1127 (M.D.Ala.1994) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. at 723, 107 S.Ct. at 3085). "The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectations when he accepted the case." *Johnson*, 488 F.2d at 718. In this case, there was no written agreement which would demonstrate the fee expectations of any of the plaintiffs' counsel.

*Novelty and Difficulty of the Questions:* "Cases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may 'make new law.' Instead, he should be appropriately compensated for accepting the challenge." *Johnson*, 488 F.2d at 718.

The issues on which the plaintiffs prevailed—opposing the preclearance of two districting plans proposed by Greensboro, and

persuading the court to implement their preferred plan instead—and the legal and factual questions raised by these issues were complex. Indeed, the recent decisions in this case have already generated a number of law journal articles, some complimentary and some not. *See, e.g.,* Joshua Drew, *Snapshots from the Jurisprudential Wilderness; The Federal Courts' Understanding of the Equal Protection Clause in the Voting Rights Arena,* 5 Va. J. Soc. Pol'y & L. 373, 431 (1998); Benjamin E. Griffith, *Implementing the Race-predominant Standard for State and Local Government Redistricting Plans,* 27 Stetson L.Rev. 835 (1998). Further, the law on the voting rights of minorities is evolving and changing almost daily, as evidenced by the appearance of the *Miller* decision in the course of the present litigation. *See also Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996).

■ *Skill Required to Perform the Legal Services Properly:* "The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson,* 488 F.2d at 718.

Complex federal civil rights cases, and especially voting rights actions, require skilled attorneys. Still and Blacksher met this standard and performed the work that was required in a professional manner.

*Experience, Reputation, and Ability of the Attorneys:* "Most fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation. An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience." *Johnson,* 488 F.2d at 718.

Still and Blacksher are indisputably experienced attorneys. Both have over 20 years of legal experience, and have developed strong reputations as attorneys specializing in voting rights and other civil rights litigation. *See Medders v. Autauga County Bd. of Educ.,* 858 F.Supp. 1118, 1128 (M.D.Ala. 1994). Moreover, as stated, this case was

complex, and the work done by Still and Blacksher was of the highest caliber. More importantly, the court is convinced that their expertise enabled Still and Blacksher to prosecute this case very efficiently. Attorneys with less knowledge and experience would have taken many more hours to pursue this litigation. Therefore, their "efficiency justifies an hourly rate at the high end of the customary range." *White v. Alabama,* No. 94–T–94–N, 1996 WL 378235, at *5 (M.D.Ala. June 20, 1996) (quoting *Gay Lesbian Bisexual Alliance v. Sessions,* 930 F.Supp. 1492, 1497 (M.D.Ala.1996)); *see also Coleman v. Cannon Oil Company,* 911 F.Supp. 510, 515 (M.D.Ala.1995) ("A lawyer already skilled in the area could demand a higher rate because he or she would be more knowledgeable and could work more efficiently"); *Dillard v. City of Elba,* 863 F.Supp. 1550, 1553 (M.D.Ala.1993) (experienced attorneys prosecuted case in fewer hours than inexperienced attorneys would have); *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 744 F.Supp. 1061, 1071 (M.D.Ala.1988) (attorney's "inexperience should be reflected in [lower] ... hourly rate"), *aff'd,* 891 F.2d 842 (11th Cir.1990).

*Time Limitations:* Where there has been "[p]riority work that delays the lawyer's other legal work," this factor requires "some premium." *Johnson,* 488 F.2d at 718. There is no evidence of such limitation here.

*Preclusion of Other Employment:* This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson,* 488 F.2d at 718. There is no evidence in the record that this factor is applicable here.

*Undesirability of the Case:* "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant.... Oftentimes his decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries." *Johnson,* 488 F.2d at 718. Moreover, civil rights litigation is seen "as very

undesirable because it stigmatizes an attorney as a 'civil rights lawyer' and thus tends to deter fee-paying clients, particularly high-paying commercial clients, from seeking assistance from that lawyer." *Stokes v. City of Montgomery*, 706 F.Supp. 811, 815 (M.D.Ala. 1988), *aff'd*, 891 F.2d 905 (11th Cir.1989) (table).[26] The results of such litigation tend to arouse the emotions of all concerned, and frequently the attorneys who bring these cases are the subjects of prolonged and vitriolic hostility. This factor "can have an economic impact on [an attorney's] practice which can be considered by the Court." *Johnson*, 488 F.2d at 718.

This was an undesirable case. In general, civil rights litigation is seen as undesirable for the reasons described above. But more importantly here, this was a highly politically-charged case in the city of Greensboro, and it generated strong emotions between counsel.

*Nature and Length of Relationship with Client:* There is no evidence that any of the plaintiffs' counsel had any prior professional relationship with the plaintiffs.

*Awards in Similar Cases:* "The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit." *Johnson*, 488 F.2d at 719. The court has awarded non-contingent fees in the range of $125 to $290 an hour in other civil rights cases. *See, e.g., White v. Alabama*, No. 94–T–94–N, 1998 WL 60938, at *12 (M.D.Ala. Feb.4, 1998); *White v. Alabama*, No. 94–T–94–N, 1998 WL 117896, at *10 (M.D.Ala. Feb.3, 1998); *White v. Alabama*, No. 94–T–94–N, 1996 WL 378235, at *6 (M.D.Ala. June 20, 1996); *Gay Lesbian Bisexual Alliance*, 930 F.Supp. at 1498; *Reynolds v. Alabama Dep't of Trans.*, 926 F.Supp. 1448, 1459 (M.D.Ala.1995); *Coleman*, 911 F.Supp. at 516; *Lee v. Randolph County Bd. of Ed.*, 885 F.Supp. 1526, 1531–32 (M.D.Ala.1995); *James v. City of Montgomery*, 1995 WL 271138 (M.D.Ala. April 19, 1995); *Stokes v. City of Montgomery*, 157 F.R.D. 514, 519 (M.D.Ala.1994); *City of Elba*, 863 F.Supp. at 1554; *Medders*, 858 F.Supp. at 1129; *Wyatt v. King*, No. 3195–N, 1991 WL 640065, at *3

(M.D.Ala. Dec.17, 1991), *aff'd*, 985 F.2d 579 (11th Cir.1993) (table); *Robinson v. Alabama State Dept. of Educ.*, 727 F.Supp. 1422, 1428 (M.D.Ala.1989), *aff'd*, 918 F.2d 183 (11th Cir. 1990) (table); *Stokes*, 706 F.Supp. at 815.

Additionally, this court has twice awarded Still and Blacksher attorneys' fees in voting rights cases at the rate of $290 per hour, *see Medders*, 858 F.Supp. at 1127–28; *City of Elba*, 863 F.Supp. at 1553–54. Based on the foregoing criteria, the court concludes that Still and Blacksher are entitled to $290 an hour.

### 3. *Lodestar Calculation*

The unadjusted lodestar for an attorney consists, as stated, of the product of the attorney's compensable hours multiplied by the prevailing market fee. The lodestars for the plaintiffs' attorneys are therefore calculated as follows:

| | | |
|---|---|---|
| Still: | 282.14 hours × $290 = | $ 81,820.60 |
| Blacksher: | 198.24 hours × $290 = | $ 57,489.60 |
| TOTAL: | | $139,310.20 |

An adjustment of the lodestar either upward or downward is unwarranted.

### D. Appropriate Expenses

The plaintiffs seek $ 37,256.38 for expenses (Still—$ 16,682.38 and Blacksher—$ 20,574.00) incurred in connection with the litigation. With the exception of routine overhead office expenses normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation or as an aspect of settlement of the case, may be taxed as costs; the standard of reasonableness is to be given a liberal interpretation. *Loranger v. Stierheim*, 3 F.3d 356, 363 (11th Cir.1993); *NAACP v. City of Evergreen*, 812 F.2d 1332, 1337 (11th Cir.1987); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1192 (11th Cir.1983).

The court, however, cannot determine on the current record how much the plaintiffs should recover for expenses. As stated, the trial court cannot determine whether a party should recover expenses for appellate work; only the appellate court before which the party appeared can do that. Still and

---

**26.** *See also Medders*, 858 F.Supp. at 1128; *Robinson v. Alabama State Dept. of Educ.*, 727 F.Supp. 1422, 1428 (M.D.Ala.1989), *aff'd*, 918 F.2d 183 (11th Cir.1990) (table).

Blacksher have not indicated in their submissions which of their expenses were for appellate work. The court will therefore give the plaintiffs an opportunity to breakdown their expenses so as to indicate which were for appellate work and which were for work in this trial court.

█ Additionally, the plaintiffs seek expenses and costs for an expert they retained. Greensboro contests the compensability of these expert-associated expenses, arguing that such expenses may not be awarded in voting-rights cases pursuant to § 1973*l* (e). The court agrees with Greensboro. In *West Va. Univ. Hospitals v. Casey*, 499 U.S. 83, 101, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991), the Supreme Court held that a plaintiff could not recover expert witness fees under § 1988 in excess of the per diem attendance fees set forth in 28 U.S.C.A. § 1821(b), as provided by 28 U.S.C.A. § 1920. The Court refused to permit such shifting of expert fees and expenses in the absence of language indicating that Congress intended to shift 'expert witness fees' or 'reasonable litigation expenses,' as it had done in other contemporaneous statutes.[27] *Id.* Similarly, in *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1574–75 (11th Cir.1988), the Eleventh Circuit held that expert fees were not recoverable under the Equal Pay Act, 29 U.S.C.A. § 206(d)(1), which did not specifically provide for the shifting of such expenses. The *Glenn* holding was based largely upon the Supreme Court's decision in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987), in which the Court broadly held that "absent explicit statutory or contractual authorization for the taxation of costs, federal courts are bound by the limitations set out in 28 U.S.C.A. § 1821 and § 1920."

Based upon these authorities, and in recognition of the fact that § 1973*l* (e) does not specify that expert witness fees may be recovered as part of a fee award under the Voting Rights Act, the court finds that the plaintiffs may recover under § 1973*l* (e) only their expert-associated expenses as set forth in 28 U.S.C.A. § 1920 and 28 U.S.C.A.

§ 1821(a), specifically at a rate of $40.00 per day of attendance.

However, the plaintiffs are not relying on § 1973*l* (e) only. They are also relying on the 1988 consent decree, which expressly authorizes the award of "expenses" to the plaintiffs. The question therefore is whether the term "expenses," as used in the 1988 consent decree, includes expert witness fees and expenses. Admittedly, the Supreme Court itself has read "expenses" to include expert witness expenses. The Court has stated that the phrase "reasonable litigation expenses," as employed in the contemporaneous statutes, plainly referred to expert witness fees. *Casey*, 499 U.S. at 88–89 & n. 4, 111 S.Ct. at 1141–42 & n. 4. Nevertheless, the parties have not informed the court on what they intended by the term "expenses" in the 1988 consent decree. The court will therefore give the parties an opportunity to educate the court on this issue.

### III. GREENSBORO'S MOTION FOR ATTORNEYS' FEES AND EXPENSES

█ Greensboro's motion for a fee-and-expense award is not only inexcusably late, it raises, by contrast, very different issues, principally whether a *defendant* in an action brought pursuant to the Voting Rights Act may recover its attorneys' fees, expenses, and costs from the plaintiff, where the defendant has prevailed as to certain aspects of the remedial phase of the litigation.

█ It is now well established that a defendant in action under 42 U.S.C.A. § 1983 is precluded from obtaining a fee award as a prevailing party under § 1988, absent a finding that the plaintiffs' suit was "frivolous, vexatious, or without foundation." *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418–421, 98 S.Ct. 694, 699–700, 54 L.Ed.2d 648 (1978); *Paradise v. McHenry*, 809 F.Supp. 899, 901 (M.D.Ala.1992) (noting that the public policy objectives and concerns favoring an award of attorneys' fees to prevailing plaintiffs in civil rights actions "do not

---

**27.** After the Supreme Court's decision in *Casey*, Congress amended § 1988 to specifically permit the recovery of expert fees. *See* 42 U.S.C.A. § 1988(c). However, that provision is expressly

limited to actions brought pursuant to 42 U.S.C.A. § 1981 or 42 U.S.C.A. § 1981a, and does not include Voting Rights Act lawsuits. *See id. See also supra* note 19.

apply to defendants—in particular, because a losing plaintiff is not 'a violator of federal law.' ") (quoting *Christiansburg*, 434 U.S. at 418, 98 S.Ct. at 700). The reasoning that led the Supreme Court to reach this conclusion for fee request under § 1988 applies as well to those under the fee-awarding provision of the Voting Rights Act. Therefore, a defendant in an action under the Voting Rights Act is precluded from obtaining a fee award as a prevailing party under § 1973*l* (e) absent a finding that the plaintiff's suit was frivolous, vexatious, or without foundation. No such finding, of course, is warranted here as to any aspect of the post-consent-judgment litigation, and therefore the court holds that the general rule applies to defeat Greensboro's claim.

▇▇▇ The court recognizes that there are circumstances where application of the general rule is not warranted. *See, e.g., Commissioners Court of Medina County v. United States*, 683 F.2d 435, 439 (D.C.Cir.1982). For instance, citing the legislative history of § 1973*l* (e), the *Medina* court held that where "the procedural posture of a case places the party who seeks to vindicate rights guaranteed by the Constitution in the position of defendant," the restrictive general rule is not applicable. *Id.* at 439–40. *Medina* concerned the entitlement to attorneys' fees of a defendant-intervenor who voluntarily entered a suit, and who therefore occupied a position significantly more analogous to a plaintiff than that occupied by a named defendant like Greensboro. *Cf. Paradise v. Prescott*, 626 F.Supp. 117, 118 (M.D.Ala.1985) (holding that, although white officers who challenged a court-approved promotion scheme for state troopers were nominally defendant-intervenors in the lawsuit, they were "functionally plaintiffs" who could not be held liable for the plaintiffs attorneys' fees absent a finding that the white officers' claims were "frivolous, unreasonable, or without foundation"). Unlike the defendant-intervenor in *Medina*, here Greensboro did not participate in this lawsuit as a functional plaintiff, even after the 1987 consent judg-

ment was entered, because it did not—and, indeed, could not—allege that the plaintiffs, private citizens, had violated federal law by implementing an unconstitutional districting scheme. Consequently, there is no legitimate basis upon which to permit Greensboro to recover its fees, expenses, and costs from the plaintiffs, and therefore the city's motion is due to be denied.[28]

## IV. CONCLUSION

In summary, the court will award the plaintiffs their attorneys' fees in the amount of $ 139,310.20 pursuant to § 1973*l* (e) and the 1988 consent decree. With regard to expenses, the court will give the plaintiffs 14 days to indicate which of their expenses are for appellate work and which are for work in this trial court, and the court will give the parties 14 days to submit evidence and argument on whether the term "expenses," as used in the 1988 consent decree, includes expert witness expenses and fees.

Accordingly, for the above reasons, it is ORDERED that the motions for award of attorney's fees, costs and expenses, filed by plaintiffs John Dillard, et al., on March 28 and May 13, 1997, are granted to the extent that plaintiffs Dillard, et al., shall have and recover from defendant City of Greensboro the sum of $ 139,310.20 for attorney's fees.

It is further ORDERED that the plaintiffs are allowed 14 days from the date of this order to indicate which of their expenses are for appellate work and which are for work in this court.

It is further ORDERED that the parties are allowed 14 days from the date of this order to submit evidence and argument on whether the term "expenses," as used in the 1988 consent decree, includes expert witness expenses and fees.

It is further ORDERED that the motion for leave to file an application for fees and expenses, filed by defendant City of Greensboro on April 30, 1997, is denied.

---

**28.** Greensboro seeks $ 28,296.00 in fees ($ 10,-584.00 for the appeal and $ 17,712.00 for post-appeal proceedings) and $ 6,229.30 in expenses. Therefore, to the extent that Greensboro seeks its fees, expenses, and costs associated with the appeal to the Eleventh Circuit, this trial court, as stated previously, may not make such an award, even if the city could attain prevailing party status.

*SUPPLEMENTAL ORDER*

*Expenses for Appellate Work:* Counsel for the plaintiffs have filed affidavits indicating that, of their requested expenses, $905.50 was spent for appellate work.[1] Therefore, plaintiffs' expense request for $37,256.38 will be reduced by $905.50

*Whether the Term "Expenses," as Used in the 1988 Consent Decree, Includes Expert Witness Expenses:* Counsel for the plaintiffs and defendant City of Greensboro agree that "there was no expressed consideration or discussion by lawyers for plaintiffs or defendants about expert witness fees and expenses."[2] Therefore, the court must conclude that the parties reached no expressed agreement or understanding on this issue. The 1988 consent decree, however, provides that, "The plaintiffs' attorneys shall be able to assert whatever claim for fees and expenses for such 'extraordinary work' that they contend is allowed by law." Because, as explained in the order entered on January 14, 1999, expert witness fees are not "allowed by law" in voting rights cases, the court will allow the plaintiffs to recover fees for the expert witness only to the extent of $40.00 for each occasion the expert witness testified. The plaintiffs seek to recover for seven instances for which they used expert witnesses.

| | |
|---|---:|
| Bobby Wilson | $ 1,350.00 |
| Craig Remington | 165.00 |
| University of Alabama | 1,240.00 |
| Gerald Webster | 4,500.00 |
| Jeff Norrell | 13,000.00 |
| Gordan Henderson | 5,128.68 |
| Gordan Henderson | 5,699.71 |
| Total | $31,083.39 |

Of this amount, the plaintiffs may recover only $210.00 ($40.00 for each occasion). The plaintiffs' expense request, therefore, will be reduced by $30,873.39 ($31,083.39 minus $210.00).

*Conclusion:* The plaintiffs' expense request will therefore be reduced as follows:

| | |
|---|---:|
| | $37,256.38 |
| | − 905.50 |
| | −30,873.39 |
| Total | $ 5,477.49 |

The plaintiffs may therefore recover $5,477.49 for expenses.

---

**1.** Counsel for Greensboro has orally informed the court that he does not challenge this breakdown for appellate work.

Accordingly, for the above reasons, it is ORDERED that the motions for award of attorney's fees, costs and expenses, filed by plaintiffs John Dillard, et al., on March 28 and May 13, 1997, are granted to the extent that plaintiffs Dillard, et al., shall have and recover from defendant City of Greensboro the additional sum of $5,477.49 for costs and expenses.

---

**2.** Plaintiffs' response, filed on January 28, 1999, at 2.